UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       -v-                            **18 Cr 323 (JSR)**

EZRA CHOWAIKI,

                    *Defendant.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **DEFENDANT EZRA CHOWAIKI'S SENTENCING MEMORANDUM**

                            Respectfully submitted,

                            Daniel S. Parker
                            Parker & Carmody, LLP
                            Attorney for Defendant
                            850 Third Avenue - 14th Floor
                            New York, NY 10022
                            DanielParker@aol.com
                            Tel: (212) 239-9777

Dated: New York, NY
       September 17, 2018

**PARKER AND CARMODY, LLP**
ATTORNEYS AT LAW
850 THIRD AVE
14TH FLOOR
NEW YORK, N. Y. 10022

DANIEL S. PARKER
MICHAEL CARMODY
CHRISTINA S. COOPER

TELEPHONE: (212) 239-9777
FACSIMILE:  (212) 239-9175
Email: DanielParker @ aol.com

September 17, 2018

**By ECF**
Hon. Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: United States v. Ezra Chowaiki
18 Cr 323 (JSR)

Dear Judge Rakoff:

## I. PRELIMINARY STATEMENT

Ezra Chowaiki  ("Mr. Chowaiki" or "the defendant") is a broken, humiliated, humbled man who is incredibly and sincerely sorry for the damage he has done to others – some of whom he cared about deeply.

At age 49, Mr. Chowaiki has led an otherwise exemplary life, one devoid of criminal behavior, a life in which, prior to this case, he assiduously avoided opportunities to engage in fraud. A life marked by a stellar reputation as a result of years of hard work and self-education.

Yet as his business failed and his years of hard work began to crumble, compounded by his own psychological issues – fighting severe and prolonged depression – he caved.  Unable to come to terms with the idea that everything he had spent his life building was collapsing, he engaged in fraudulent and criminal conduct.  Still, acting with delusion, he persuaded himself at

1

the time that he would pay back what he had stolen, that his actions were only temporary, and

that if he could only sell that one next painting, he would re-pay everyone in full.

He cannot be more repentant for his failures and his actions.

Mr. Chowaiki has not only come to recognize how much harm he caused others, but he

also recognizes that he will be severely punished for his misdeeds and he will be permanently

stigmatized and ostracized.

He should not be held to the onerous guideline calculations that would send him to prison

for 51-63 months as a result of his actions.

Probation, in its final Pre-Sentence Report ("PSR"), recognizes that Mr. Chowaiki should

not be sentenced to a guideline sentence. Probation recommends a downward variance and a

prison sentence of 36 months. (PSR at p. 28)

The PSR notes:

> "... we believe that a variance from the defendant's sentencing guidelines may be warranted.
>
> ...[T]he defendant is a first-time offender who initially engaged in the offense at age 46.  Available information suggests that Chowaiki was not living a particularly lavish lifestyle nor was he using the funds from the offense to facilitate an addiction.  The defendant has stated that he committed the offense in an effort to salvage his art gallery business... His ex-wife stated that Chowaiki was a workaholic who was devoted to his business.
>
> ... The defendant appears to pose a low risk of recidivism.
>
> ... [I]t is our belief that a 36-month term of imprisonment is a reasonable sentence in this case, as it would address the sentencing objectives of punishment and deterrence."

PSR at p. 29.

Although we greatly appreciate the thoughtfulness exhibited by Probation in its

recommendation, we submit that there are additional compelling reasons, some not known to Probation, why Mr. Chowaiki should be sentenced to a lesser period of incarceration.

For reasons set forth in 18 U.S.C. § 3553(a) and exemplified herein, we ask this Court to impose a prison sentence of one year and one day.

The following factors all militate in support of a sentence far less than the one called for under the Guidelines and for a sentence of one year and one day:

- Mr. Chowaiki accepted responsibility for his actions and admitted his guilt immediately. He surrendered to law enforcement authorities, he waived indictment, and he pleaded guilty at the first appearance before this Court;

- Mr. Chowaiki, suffering from deep and troubling psychological issues ranging from depression and self-esteem issues to untreated trauma, deluded himself into believing he would pay people back.  It was never his intent to permanently deprive people of their artwork or its value;

- His remorse is real, not manufactured for the Court, and as this case has progressed, his depression resulting from his remorse has deepened. His psyche and psychological state at the time he committed this crime are symptoms of his own psychiatric illness and as will be explained in more detail below, should be considered by the Court as a mitigating factor of significance;

- Although he used the proceeds of this crime to prop up his business, he did not engage in avaricious conduct designed to enrich himself or support a lifestyle fueled by greed.   Despite working in a world where wealth has no

3

boundaries,  Mr. Chowaiki has virtually no significant assets to his name

and was not living a lifestyle commensurate with the loss sustained here;

- █████████████████████████████████████████████████████

- Mr. Chowaiki ████████ offer to cooperate *after* he pleaded guilty so

that he could provide the Government with information relevant to the

various claims of ownership of artworks at issue;

- Indicative of the inherent unreliability of the loss factor  as a means of

measurement of Mr. Chowaiki's criminal culpability in this case, one of

the paintings to which Mr. Chowaiki admitted engaging in fraudulent

conduct was calculated at a value of $7.8 million in the plea agreement,

but a few weeks later the painting was analyzed by a Government expert

and its value was deemed to be $1.5 million.  As will be discussed more

fully below, this is an example of how an appropriate punishment for Mr.

Chowaiki should not be directly tied to the perceived value of the works of

art at issue;

- The Guidelines in this case are driven by a loss amount which is not

reflective of a trait consistent with calculating how long a prison sentence

Mr. Chowaiki deserves. This is particularly so because the loss is

calculated by the estimated, approximated, speculative and ever-changing

value of a luxury item such as artwork;

- After assessing the severity of the crime and the harm caused, as well as

4

Mr. Chowaiki's history and character – he has a history of charity and demonstrable kindness towards others – a prison sentence far less than a guideline sentence would be reasonable and just;

- Mr. Chowaiki suffers from both physical and mental health issues which will only be exacerbated by incarceration;

- Any sentence of imprisonment will undoubtedly have a significant punitive and specific deterrence impact upon Mr. Chowaiki. His primary asset both personally and professionally was his reputation. It is now permanently damaged and irreparable. He will never again work successfully in the field to which he devoted his life and passion;

- Any sentence of imprisonment will serve the broader purposes of specific and general deterrence, but a punishment tied to the Guidelines will confuse two concepts: the concept of wrongfulness with the concept of whether wrongfulness should be measured by artificial numeric calculations.

In sum, for reasons that will be set forth in greater detail below, we ask the Court to impose a prison sentence of one year and one day.

## II.  A BRIEF OVERVIEW

This wirefraud case is the result of the actions of Mr. Chowaiki, a minority owner and the proprietor of Chowaiki and Co., a renowned and reputable art gallery ("the Gallery") located at 500 Park Avenue, New York. Mr. Chowaiki – a self-taught art expert – spent years cultivating his craft and reputation, assisting wealthy owners and investors in exclusive art, purchase and sell

5

paintings of some of the most famous artists in the world, ranging from *Degas* to *Picasso*.

The Chowaiki Gallery, financially backed by David Dangoor, had been operating since on or about 2005. At some point, in or about 2008, Mr. Chowaiki discovered that his then partner, Luba Mosionzhnik, was stealing from the Gallery and the Gallery had lost millions of dollars. In an effort to avoid paying him back and in anticipation of his suing her, she preemptively sued him. He then asserted his claims against her for fraud and theft. Given the complicated and sophisticated nature of her actions, the case dragged on, costs rising to in excess of $1.5 million in legal fees, and after Mr. Chowaiki's attorney fumbled the litigation, Mr. Chowaiki and the Gallery were left no choice but to settle the litigation by dropping their claims – even though they had done no wrong and had lost incalculable sums, estimated to be in excess of $5 million dollars.

As Mr. Chowaiki continued to engage in the business of buying, selling and brokering high end transactions for works painted by the *creme de la creme* of the art world, his business could not recover from the financial burden resulting from its dispute with Ms. Mosionzhnik. As his business failed and his mental state spiraled downward, in or about 2015, Mr. Chowaiki began to engage in fraudulent transactions. From 2015-2017, Mr. Chowaiki defrauded some buyers and sellers of paintings by representing that the funds given to him would be invested to purchase a particular work, when in fact, he used the money to pay existing obligations; and he used paintings that had been consigned to the Gallery as collateral for loans – upon some of which he defaulted. As he engaged in this conduct, he convinced himself that if he "could just sell" a particular painting, or a series of particularly valuable pieces, he could generate enough of a profit, to re-pay those who he had defrauded. His intention was always to pay people back.

6

Mr. Chowaiki realizes that the financial precipice upon which he found himself does not justify or excuse his actions. Mr. Chowaiki knew that what he was doing was illegal and he knows that even though he intended to pay people back, he did not have their consent to engage in that conduct and that regardless, his actions were wrong.  Contextually, he was not thinking clearly, his acts were driven by desperation, and his desperation was exacerbated by a personal crisis.

In 2016, Mr. Chowaiki – a loving and caring father – got divorced and his children, ███████████████████████████████ were living with his ex-wife.  Mr. Chowaiki was deeply worried that if his business collapsed, he would not be able to meet his financial obligations as part of his divorce decree, he would not be able to provide necessary support for his children and that if he so failed, the they would suffer and he would lose them.  His thought process may not have been the most cogent, but it resulted in this "perfect storm" causing him to engage in acts that were completely aberrant.  He remains overwhelmed with guilt and truly sorry for his actions as well as for the harm he caused.

### III.  FACTORS RELEVANT TO SENTENCING

**A.      Mr. Chowaiki's extraordinary acceptance of responsibility**

Mr. Chowaiki first learned of the United States Attorney's office investigation on or about November 2017.  Mr. Chowaiki was terminated from his employment and the Gallery filed for bankruptcy.  At the time, there were legitimate deals pending for certain works of art that were on the verge of closing which would have helped secure assets to reimburse some of the victims.  Mr. Chowaiki, through counsel, immediately agreed to surrender.  Because the Government was investigating the case and because many of the issues involving the actual – or

presumed to be actual – value of certain paintings remained unresolved, Mr. Chowaiki was not asked to surrender immediately. On December 15, 2018, Mr. Chowaiki surrendered to law enforcement, was presented before the Magistrate and was released on bond.

Thereafter, Mr. Chowaiki – ████████████████████████████████ attempted to provide the Government with information which it could use to determine a reliable loss factor.  Even though Mr. Chowaiki offered to plead guilty from the inception of this case, given the complex, speculative and fluctuating values of the artwork relevant to determining a "loss factor," a plea agreement was not finalized until April 30, 2018.   A Notice of Intent to plead guilty to an Information was signed two weeks prior.  Mr. Chowaiki pleaded guilty on May 3, 2018.  He not only accepted responsibility, but did so immediately and completely.

## B.    Mr. Chowaiki's Psychological Issues

To gather a deeper understanding about the aberrant nature of his conduct in this case, it is important to have a more thorough understanding of the long-standing, psychological issues that have plagued Mr. Chowaiki.

His severe anxiety and depression caused him to see a therapist starting when he was 8 years old.  As a child, Ezra was physically and emotionally abused by a caretaker for several years. He was extremely overweight, resulting in severe self-esteem issues.  He was diagnosed with Type 2 Diabetes in or about 2009 and he injects himself with insulin on a daily basis.

As an adult, he experienced severe mood swings, ranging from euphoria when he successfully closed a deal and satisfied clients to depression and severe anxiety when he could not cope with the pressures of his business and personal life.

In about 1992, when he was 23 years old, Mr. Chowaiki was finally diagnosed as

8

suffering from depression.  He has been in treatment since then.  He has been prescribed drugs such as Paxil for depression and anxiety and Prozac for depression.  Over the years, different doctors have prescribed various alternative anti-depressant and anti-anxiety medications in an effort to combat his depression and anxiety.  Mr. Chowaiki has also been prescribed Zoloft and Wellbutrin. Since 2005, Mr. Chowaiki has been treated by Dr. James Coane.  Attached hereto as Exhibit A is a letter from Dr. Coane who describes in detail Mr. Chowaiki's history of abuse, his being raised in a dysfunctional family, his long-term struggle with severe psychological issues, and how this background and these psychological issues impacted on Mr. Chowaiki's actions.[1]

In or about 2014, Mr. Chowaiki's mental health continued to deteriorate as did his marriage and a treating psycho-pharmacologist upped his medication dosages. Mr. Chowaiki takes a daily regimen of Wellbutrin.  Up until December 2017, Mr. Chowaiki also took Vyvaanse, a medication to treat ADHD (PSR ¶ 70).[2] These severe psychological issues are directly related to Mr. Chowaiki's criminal conduct in that he also suffered from a low self-esteem as a result of abuse he suffered years ago as a child. (See PSR ¶¶ 51, 67-72)

In 2008, Mr. Chowaiki's Gallery suffered a huge financial hit when his partner stole from him and the litigation and incompetent counsel drained him financially.  The Gallery

---

[1] Probation was not in possession of this letter from Dr. Coane and did not have the benefit of Dr. Coane's assessment when it completed its report.  Because this letter references confidential medical information relating to others, a redacted verison is attached hereto.

[2] Unfortunately, some studies have shown that Vyvanse, if prescribed in too high a dosage, can have a "reverse" effect and in retrospect, Mr. Chowaiki now believes that this amphetamine contributed to his mental instability.  See https://www.mentalhelp.net/articles/effects-of-vyvanse-abuse  Also see the letter from Dr. David Shernoff, Associate Professor in the Graduate School of Applied and Professional Psychology at Rutgers University which is contained in Exhibit B. Dr. Shernoff, a friend of Mr. Chowaiki's, shares his insight about how this diagnosis impacts Mr. Chowaiki's behavior, compulsivity, and ultimately, acts which related to his criminal conduct.

continuously struggled to recover and in or about 2015, the Gallery sustained deeper losses when it advanced $500,000 in a deal that turned out to be a fraud – and it was victimized.  In 2016, his marriage disintegrated.  His children, who have their own mental health issues, were dependent upon him.  As his professional and personal world spun out of control, Mr. Chowaiki – desperate and deluding himself– convinced himself that in order to save the business that he had built over years and be able to support his children, he could temporarily "borrow" other people's money and he would pay them back.  He never intended to permanently deprive the victims in this case.  He wrongly justified his actions, thinking "if I could only close the next deal ..."

Once again, Mr. Chowaiki does not justify his actions or seek to blame them on his mental health issues, but they are certainly relevant considerations for this Court in determining an appropriate sentence.  His crimes were not motivated by avarice.  He did not maintain a lifestyle enriched by expensive material goods or lavish spending.[3]   In hindsight, he recognizes that he acted selfishly.

In a candid and insightful analysis of Mr. Chowaiki, Dr. Coane writes in pertinent part:

> "Ezra Chowaiki has been my patient since April 28, 2005.  He presented with a number of highly stressful, conflict laden aspects of his life that had become somewhat overwhelming and increasingly exacerbating his personality traits...

> ...Clinically, it became quite clear that he had a generalized anxiety disorder that

---

[3] Contrary to the Victim Impact Statement of John Cavaliero, Mr. Chowaiki did not lead a lavish lifestyle.  In the world of absurd wealth in which Mr. Chowaiki was recruiting buyers and sellers, he acted in a manner consistent with his role as owner of a high end art gallery in an effort to close deals that he hoped would give him the ability to pay people back. He did not line his pockets with money as his total income was salary-based and disproportionately low relative to the size of the transactions in which he was engaged. For example, he was not paid on commission nor did he receive a percentage of the transactions.  Lastly, as noted in the PSR, he has virtually no savings or assets.

distorted his personality and often made him feel insecure and defensive.  In addition, it became apparent that his neuro-endocrinological style was consistent with the diagnosis of Attention Deficit Disorder.

...Ezra indicated to me that he had a very difficult financial situation with some clients that he was trying to finesse so that all would be well.  Apparently, his attempts to do this resulted in the implosion of his career and personal life. He deeply regrets it all, and is still wrestling with the character trait of overestimating his ability to handle these problems on his own.  His ability to thrive on intense levels of stimulation is a true benefit when in the service of accurate assessments of reality.  When separated from reality by the 'personality' from his childhood, his decisions are fraught with risk and poor judgement.

...I am hoping the court will take these factors into consideration and be part of Ezra's redemption and desire to be the more authentic person that I have come to know."

Also see a letter[4] from Dr. David Shernoff, a close friend of Mr. Chowaiki's, who is an

Associate Professor of Clinical Psychology at Rutgers University. In reference to Mr. Chowaiki's

psychological make-up, he writes:

... The hallmark symptom of ADHD is compulsivity,[5] or the inability to control one's impulses.  Ezra has also struggled with a high level of distractability...

Inasmuch as his clinical symptoms affect his behavior, which they of course do, I think that it may be a relevant factor in some of his business situations... The interaction between Ezra's compulsivity (over which he cannot always control), his passion for and vast knowledge of art, and his assuming of inadvisable risk in his business transactions (at least in retrospect) appeared to have accumulated over time.

...[W]hat jumped out to me... is that Ezra's behavior arising from his predicament was most similar to what the American Psychological Association now recognizes

---

[4] Probation was not in possession of this letter from Dr. Shernoff and did not have the benefit of Dr. Shernoff's insights when it completed its report.

[5] See https://www.ncbi.nlm.nih.gov/pubmed/20410321 (Cite not included in letter from Dr. Shernoff)

as a Gambling Disorder.[6]  As Ezra dug himself a deeper and deeper financial hole, he took on increasing risk in order to dig out – not only for himself but for those he felt responsible."

## C.   Mr. Chowaiki's deep and sincere remorse

Mr. Chowaiki is deeply sorry for his actions and his genuine remorse and guilt have further exacerbated his mental illness.

He told Probation during the Pre-Sentence Interview ("PSI"), that "this [crime ]was the worst mistake of my life." (PSR 30).  His feelings of remorse are particularly painful when it comes to people he cares about and loves.  He reviewed the Victim Impact Statement from Bogomila Welsh-Ovcharov and was overwhelmed with shame.

In 2018, while under Pre-Trial Supervision, Mr. Chowaiki was diagnosed with a Major Depressive Disorder and Pre-Trial recommended that he undergo more frequent counseling.

In a psycho-social summary dated April 20, 2018, Adam Siroky, M.S.W., who Mr. Chowaiki was seeing weekly for counseling sessions, said that he "presented symptoms of depression, anxiety, low mood, low motivation, nervousness, restlessness, fatigue and intermittent hopelessness." (PSR ¶ 72)

We submit that, like many people who are sick, albeit with a mental health illness, that the illness clouds what would otherwise be sound judgment.  It is not uncommon for people in these situations to engage in self-denial, failing to recognize the harm they are causing those around them, and when they do finally see the damage they have done, they can be overcome with sincere guilt and shame.

---

[6]  See https://rxisk.org/its-alright-ma-im-only-punding-stimulants-and-compulsions; and https://link.springer.com/article/10.1007/s10899-009-9126-z (cites not included in letter from Dr. Shernoff)

This realization significantly contributed to Mr. Chowaiki's desire to immediately plead guilty, accept responsibility, and offer to provide assistance to the Government.

**D.  Mr. Chowaiki did not seek to personally enrich himself**

As noted in the PSR, Mr. Chowaiki has a negative net worth in excess of $400,000.  He has $539 in a bank account and a life insurance policy which he is mandated to maintain for the benefit of his children.  He owes back taxes, approximately $68,000 in credit card debt, and is a defendant in at least six lawsuits.

Although he worked in a world where money knows no boundaries and art is bought and sold for prodigious sums, Mr. Chowaiki received an annual salary of approximately $200,000 and lived rather modestly.

Since his criminal acts were tied to his source of income, he has had no measurable income since November 2017 and he has been getting by with the largess and support of friends and family; even living rent free in a friend's apartment.

The lack of his financial resources is relevant to the extent that it demonstrates that Mr. Chowaiki's actions were not designed to enrich himself.  When the color of his art gallery business was going from black to deep red, his financial pressures escalated, his mental state deteriorated, and he feared that his failings would harm his children.  He panicked.  He deluded himself into believing that he would pay back whatever he obtained improperly and he remained intent on doing so.  Once again, he knows this does not excuse his actions.  However, we submit there is a difference between a person who acts with greed and with the intent to permanently deprive someone of property or a person who commits fraud so that he could live a life of luxury and a person who, under severe emotional distress, engages in conduct otherwise anathema with

13

the notion that he will pay back what he has obtained fraudulently.

These are the types of factors that we submit under a "reasonableness" determination pursuant to 18 U.S.C. § 3553(a), the Court should consider.

██████████████████████████

██████████████████████████ The art world is rife with people who try to pass off forgeries as legitimate. Because the price of exclusive, high-end art is subjective, institutional lenders are reticent to engage in such transactions. For example, a person seeking to borrow money to purchase a *Picasso* is not typically able to go to a bank and borrow the millions of dollars needed to do so. This vacuum creates an opportunity for unsavory people to try to take advantage of others.

Because Mr. Chowaiki has been engaged in the international art world for so long, he is aware of others who, for example, maintain forged paintings that they have tried to sell to him or others who have tried to hide their income and circumvent their tax obligations.

One of the "victims" in this case, Ely Sakhai, is a convicted art fraudster.[7]  When Mr. Chowaiki was desperate to raise cash, he engaged in a transaction with Mr. Sakhai, hoping against hope that Mr. Chowaiki would not be victimized.  As referenced in PSR ¶ 9, Mr. Chowaiki gave certain paintings to Mr. Sakhai to sell, but Mr. Sakhai gave the paintings to his own clients and represented that the paintings belonged to Mr. Sakhai.  Desperate to get them back and lacking any leverage, Mr. Chowaiki cut deals with Mr. Sakhai and Mr. Sakhai's lawyer to get certain paintings out of Mr. Sakhai's hands and into what he believed was a safer environment.

---

[7] See United States v. Sakhai, 04 Cr 583 (LAP) (S.D.N.Y July 6, 2005)

14

Correspondence seized by the Government between Mr. Chowaiki and Mr. Sakhai's lawyer, Malcolm Taub, confirms that Mr. Chowaiki was attempting to re-capture paintings that he believes Mr. Sakhai "held for ransom" from him.



**F.    Mr. Chowaiki, after pleading guilty, ▮ offered to cooperate**

There are a plethora of ancillary proceedings related to individual works of art seized by the Government for which ownership may or may not be readily ascertainable. The related forfeiture petitions submitted to this Court raise issues as to who is the lawful owner of a particular piece of art work.

Mr. Chowaiki reiterated his willingness to sit down with the Government and offer his knowledge and expertise in helping sort out these issues.

Although the Government demurred, it said that there "might" be a time where Mr. Chowaiki's assistance would be requested. Mr. Chowaiki remains willing to provide that assistance.

**G.    Mr. Chowaiki provided assistance to victims in this case in August 2018**

Mr. Chowaiki, lacking any obligation to do so, voluntarily provided information to the

Government with respect to his knowledge of the whereabouts of certain paintings that have not yet been recovered.

At the time of the PSR, Probation identified eight paintings that are unaccounted for. Currently, the Government believes there are five whose whereabouts are not known. Mr. Chowaiki has advised the Government of where he believes these paintings can be located.

In addition, Mr. Chowaiki provided assistance to one of the parties who filed a Petition seeking to have certain stolen works of art deemed the property of their rightful owner. A review of the dispute between Alfredo Melgar, an art collector in Spain, and the Calder Foundation can be seen at ECF documents 46 and 65. In its Petition, the Calder Foundation describes the circumstances in which it believes the works were stolen by Mr. Melgar from the artist.

In 2014, Mr. Melgar consigned these works to the Chowaiki Gallery to sell. Specifically, as referenced in PSR ¶ 15, in 2014, Mr. Melgar consigned 31 drawings of Alexander Calder to the Gallery. Shortly thereafter, Mr. Chowaiki was notified by the Calder Foundation that it believed these pieces were stolen from Mr. Calder by Mr. Melgar. Mr. Chowaiki agreed not to sell them to anyone until the issue of who owned them could be resolved.

In an effort to mediate the dispute at the time – and make no or minimal profit in doing so – Mr. Chowaiki attempted to broker a settlement between the Calder Foundation and Mr. Melgar in which the Calder Foundation would provide other valuable Calder works which would be given to Mr. Melgar in exchange for the return of the drawings. Both sides agreed to the negotiated resolution because they were aware of how complicated, time-consuming, expensive and drawn out these issues can be – as well as the risks to one side if the other prevailed. Mr. Chowaiki did transfer the drawings to the Calder Foundation, but only after he believed that a

16

compromise deal was in place with Mr. Melgar. Ultimately, the deal fell through after Mr.

Melgar reneged, demanded additional compensation, and sought to re-claim the drawings that he

had allegedly stolen.

Now both the Calder Foundation and Mr. Melgar have asserted their competing claims of

ownership. Mr. Chowaiki – a learned and knowledgeable art scholar – voluntarily provided the

Calder Foundation with information about why he believed the works were stolen and why he

believes ownership should be awarded to the Calder Estate. In addition, he offered to testify with

respect to both his knowledge of the artist and his behavior as well as the circumstances of this

transaction. He stands nothing to gain by his actions.

**H.      The "Loss" calculation is not a reasonable measure of the sentence that
         Mr. Chowaiki should receive as evidenced by the drastic change in the
         loss calculation in this case**

Loss in this case is not a reasonable measure of the sentence that Mr. Chowaiki should

receive when the loss factor is calculated by the estimated, approximated, speculative and ever-

changing value of a luxury item such as artwork. Perhaps, the most clear cut example of how the

value of the art in *this* case is not immutable is shown by the value of the *Degas Danseuse en

Rose* (the "Degas") referenced in PSR ¶ 2(p).

At the time of guilty plea, the Government *estimated* that the *Degas* was valued at

$7,875,000, which contributed to the estimated loss factor total of $16,635,370. Thereafter, the

Government had the work analyzed and it was determined that its value approximated $1.5

million. In a letter to Probation dated July 11, 2018 (a copy of which is attached hereto as

Exhibit C), Mr. Chowaiki requested that the loss factor and the forfeiture amount be reduced by

at least $6,375,000 for the *Degas* as well as certain other sums for other paintings detailed in his

letter. The Government, in a letter dated July 16, 2018, (attached hereto as Exhibit D) conceded that the *Degas* forfeiture amount "*may* be reduced accordingly." (emphasis added) [8]

In its letter, the Government wrote: "Where no response is provided, the Government either does not object and/or lacks sufficient information to respond to a particular objection." Accordingly, the loss factor with respect to just the *Degas* should be reduced by at least $6,375,000.  The Government also agreed that the *Tom Wesselmann Standing Nude* is not the subject of a loss and the forfeiture amount should be reduced by $40,000.

Probation calculates that Mr. Chowaiki is responsible for a loss of "at least $9,540,370." (PSR¶ 23)

Further evidence of the artificial and unreliable value of artwork was highlighted a few weeks ago when the stock price of the highly-regarded auction house Sotheby's took an estimated 5 percent financial "hit" after two paintings, a *Picasso* and a *Modigliani* sold by Sotheby's did not fetch what the auction house anticipated it would receive – after guaranteeing certain prices to the sellers.[9]

In determining an appropriate punishment, the argument that Mr. Chowaiki deserves a "guideline" sentence when the guidelines are based on the speculative price of an inordinately expensive luxury item – and the loss factor has little baring on the measure of his wrongdoing – seems as unreliable as the value of a particular painting on a daily basis.

## I.  Mathematical calculations are not a measure of "reasonableness"

This Court, to a greater and earlier extent than many others, recognized that mathematical

---

[8]  We submit that the forfeiture amount "*should*" be reduced accordingly.

[9]  https://www.cnbc.com/2018/08/06/the-two-mystery-paintings-that-sunk-sothebys-stock.html

18

calculations do not provide an accurate measure of a person's culpability and punishment should

not be rigidly tied to a loss factor under the sentencing guidelines.

> "As many have noted, the Sentencing Guidelines, because of their arithmetic
> approach and also in an effort to appear 'objective,' tend to place great weight on
> putatively measurable quantities, such as the weight of drugs in narcotics cases or
> the amount of financial loss in fraud cases, without, however, explaining why it is
> appropriate to accord such huge weight to such factors."

*United States v. Adelson,* 441 F. Supp.2d 506, 509 (S.D.N.Y. 2006); *aff'd*, 301 Fed. Appx. 93, at
1 (2d Cir. Dec. 9, 2008)

Much has been written about sentencing in white collar cases and much has been written

or discussed about how the "loss factor" is not necessarily a facially rational method of assessing

a person's culpability or a just measurement of an appropriate prison sentence.[10] The amount of

loss is often "a kind of accident" and thus "a relatively weak indicator of the moral seriousness of

the offense or the need for deterrence." *See United States v. Emmenegger*, 329 F.Supp. 2d 416,

4278 (S.D.N.Y. 2004). *See also United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995)

(affirming seven level downward departure a contracts fraud scheme in part because the

calculated loss significantly overstated the seriousness of the defendant's conduct); *United States*

*v. Ovid*, 09-CR-216 JG, 2010 LEXIS 105390, \*4 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud

guideline, despite its excessive complexity, still does not account for many of the myriad factors

that are properly considered in fashioning just sentences, and indeed no workable guideline can

ever do so."); *United States v. Milne*, 384 F.Supp. 2d 1309, 1312 (E.D. Wis. 2005) (noting that

"[w]ith their almost singular focus on loss amount, the guidelines sometimes are insufficiently

---

[10]https://www.law360.com/articles/340366/rakoff-slams-us-sentencing-guidelines-for-being-too-harsh and
https://www.lexology.com/library/detail.aspx?g=5d5afe9e-3668-48ec-a7cb-35bc57deedc3

sensitive to personal culpability."); *see also* Allan Ellis, John R. Steer and Mark Allenbaug, *At a "Loss" for Justice: Federal Sentencing of Economic Offenses*, 25 CRIM. JUST. 34, 37, Winter 2011 ("While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case.").

In a concurring opinion in a case decided on July 23, 2013, Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation in the Second Circuit Court of Appeals, observed that "the loss guideline is fundamentally flawed." See *United States v. Corsey*, 723 F. 3d 366, 379 (2d 2013) (Underhill, J., concurring). Judge Underhill further observed that "the error of accepting intended loss as a proxy for the seriousness of this crime was compounded by the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Id. citing United States v. Dorvee*, 616 F. 3d 174, 184 (2d Cir. 2010). Thus, this Court should be skeptical of applying sentencing guidelines that "apply without modulation to a wide range of conduct" and are driven simply by the amount of money involved. *See United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008).

Since the decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738(2005), courts have not only imposed sentences far less than guideline sentences for those at the top of the range, but have imposed sentences less than guideline sentences for those at the other end of the spectrum.

As another very recent example, in June of 2018, two brothers, David and Scott Nicoll,

who admitted to bribing doctors in a $100 million health fraud scheme received sentences far below the guidelines (*See United States v. Nicoll*, 13 Cr 385 (SRC) District of New Jersey).[11] We are mindful that every case is different and unique and in the *Nicoll* case, the defendants cooperated with the Government. On the other hand, in the *Nicoll* case, the defendants were motivated by greed, spending $5 million of the proceeds of the fraud on the purchase of luxury cars. Mr. Chowaiki engaged in no such similar behavior.

The dissonance between the loss factor and a just sentence is particularly glaring in a situation like this case where the loss is calculated by the estimated, approximated, speculative and ever-changing value of a luxury item such as artwork. Because this Court is intimately familiar with the concept raised here, we believe that further discussion of the significance of this topic is not necessary herein.

### J. Mr. Chowaiki's History and Character Militate in favor of a far lesser sentence

**His History**

Mr. Chowaiki, who is just shy of 50 years old, is a kind, caring person who has worked hard his entire life, supported his family, developed meaningful friendships, helped those in need, built a business, facilitated transactions that benefitted people in the art world, and, up until this case, steered clear of invitations to engage in criminal conduct.

He has not only led a law-abiding life prior to this case, but he has led a life of honor, with humility and passion.

He is overwhelmed that his crimes here are the ruination of his professional career, and in

---

[11]https://nypost.com/2018/06/15/brothers-who-ran-100m-health-fraud-scam-sentenced-to-prison/
?utm_campaign=applenews&utm_medium=inline&utm_source=applenews

many cases, personal relationships.

Mr. Chowaiki was born in Mexico City and he had a dysfunctional childhood.  He was physically abused and was sent away from his family to boarding school in California at age 14. He received his Bachelor's of Fine Arts degree from NYU in 1991, and shortly thereafter, he went to work for his wife-to-be's family ice cream business.  He worked there from on or about 1992-1995.  From 1996-2000, Mr. Chowaiki ran an export business, selling American snack foods to countries around the world.

But his true passion remained art.

Mr. Chowaiki had an uncle and relatives engaged in the art business world and he spent time with his uncle learning the business.  In or about 2000, Mr. Chowaiki opened and operated ECN Art, a private art dealership, which he operated until 2005.  During this time, Mr. Chowaiki continued to learn how to operate a gallery, price and sell art, identify and secure customers, and evaluate the value of a particular piece of work – all the while expanding his reputation and establishing his *bona fides*.

In 2005, with the financial backing of Mr. Dangoor, Mr. Chowaiki opened his gallery, later re-named Chowaiki and Co., which was engaged in the international commerce of selling fine art.

As discussed above, the Gallery's financial crisis occurred in or about 2008 and Mr. Chowaiki remained under pressure of Mr. Dangoor to continue to generate a profit on behalf of the Gallery.

While this was going on, Mr. Chowaiki's marriage to Mindy Schwartz, who he married in 1992 at the age of 23, continued to deteriorate.  Although he loves Ms. Schwartz, in hindsight he

22

realizes that they were better together as friends than spouses.  As his marriage suffered, he remained under financial pressure to not only support himself but to provide financial support for his two children, his 20 year old son ███ and his 15 year old daughter ███ ████████████████████████████████████████████████████

Mr. Chowaiki's depression deepened and spiraled downward and he and Ms. Schwartz divorced in October 2016.  Under the terms of the divorce decree, Mr. Chowaiki was responsible for paying $8,500 per month in child support.  At the time, the Gallery was financially strapped as was Mr. Chowaiki.  Still, he believed this was a surmountable blip and that, over time, he would be able to remedy it.

Suffering from a life-long history of diagnosed psychological issues, as he saw his life's work collapsing, he become overwhelmed, and he committed the crime at issue here for which he is truly remorseful.

**His Character**

Attached hereto as Exhibit E, are approximately 36 letters from friends and family who describe and detail the other side of Ezra Chowaiki: the kind, caring, loving, reliable, trust-worthy, hard-working, personable, compassionate, responsible, person that he is. They also recount how truly remorseful he is and how he continues to hope to be able to pay people back.

In one of the most compelling letters, Alvaro Pinto, an art collector, who was going to receive money as a related party as a result of some of the transactions herein, writes:

> "We read the international news about the actual situation of Ezra Chowaiki and my family and my grandson we lose much money with Ezra in this specific situation.
>
> I need to tell that all this situation did a very big damage to my Family and our financial situation.

Is important and everyone around my family know that, and also Ezra Chowaiki know that.

But there is something very important that I need to tell about Ezra Chowaiki. I want to give our emotional support and our thoughts about the real man that Ezra is.

Ezra is a very good person and you must know that and please I ask You Help Ezra in Your final decisions.

... Ezra is a good soul person that in his 'child' way try art business with much success to all his clients and in a difficult moment also in his 'child' way he has not time to solution and he did some bad moments decisions.

... Please kindly understand that was just a bad moment business for him and not how he is.

... This letter I write to kindly ask You Dear Judge Rakoff is to you please read the humble words of a man of 90 years old that can tell you that my family we lose money with Ezra but Ezra is a amazing wonderful Man and I personally ask You in this letter to Please give Ezra opportunity.

Give Ezra opportunity ... to show everyone that he is not what this situation show about him."

His friend Dr. David Shernoff, who aside from recounting how Ezra's psychological issues contributed and related to his criminal conduct, writes in pertinent part:

"I have always known Ezra to be an extremely warm, personable, outgoing, and intelligent person with a good heart and the desire to make a contribution to others and his community... I believe he never intended or wanted to harm anybody... rather, I believe he was working very hard to work himself and his business out of accumulation of liability.... [H]e appears to be truly sorry and remorseful for the harm he has caused..."

Clay Pierce, a lifelong friend and an attorney at Drinker Biddle and Reath, LLP, writes

"... The idea that one of the most thoughtful people I knew could be involved in a fraud was at first impossible to comprehend.

... Ezra readily acknowledged when he disclosed his situation to me that he was responsible for the damage caused to his clients. I believe... [t]he stress caused by the gallery's financial difficulties was compounded by other factors – in

24

particular, depression and anxiety issues from which Ezra has suffered since college... Ultimately, these issues appear to have made an already very difficult situation virtually unbearable.

... To be clear, I do not consider any of the above to excuse Ezra's conduct, and neither does he... His extraordinary lapses in judgment notwithstanding, Ezra remains energetic, kind hearted, and intelligent person who has much to offer others... I believe Ezra will devote his talents and future time to the betterment of the community."

Norman Ian Carnick, a long time personal friend, writes:

"... Since his guilty plea I was fortunate enough to be with Ezra... when an artist friend of Ezra's ... asked, 'Why didn't you fight this?' Ezra's response was 'I need to show my children that I take responsibility for my actions.' It's my strong opinion that Ezra understands the depths of his mistakes and is looking for opportunity to atone..."

Mindy Schwartz, his ex-wife, writes:

"... Throughout [our children's] childhood, Ezra was a devoted, doting father.

...In addition to our two children, Ezra and I had a stream of children running through our house. Before our son was born, Ezra and I decided to participate in the Fresh Air Fund, an organization which places under-served, inner-city children from New York City with families throughout the East coast.

... I have tried to keep Ezra's arrest from both of our Fresh Air children... ██████ has already had to handle the incarceration of his own father on more than several occasions... Now, the only other male role model he has will be stolen from him.

...Regardless of my heartbreaking disappointment, my hope for Ezra's sentencing is leniency."

Mark DeMuro, an art dealer and friend, writes:

"...When I invited Ezra to bring his wife and kids to my family's cabin on a lake, he declined, explaining that over the summer they always mentored a young boy who came from a challenging family background. He had maintained this relationship for a number of years; the child had come to find reassurance and a sense of belonging that Ezra felt was important to his well being. He wholeheartedly embraced this role as a source of stability in the boy's life. As

with many other charitable acts he undertook, it wasn't something he advertised, it was just something he did."

Glenn Dranoff, an art gallery owner, writes:

"... He actually did something when I first met him which was extraordinary. We were working on a deal where I was selling a painting which he had on consignment from a client. My collector kept delaying the viewing and after several weeks Ezra had another buyer, and he sold it to them. Which was totally fair. A week later I opened my mail and found a check for $25,000., which was the commission I was going to make if my client had purchased it. Never before or since has that happened to me in my 37 years in the art business."

Jeffrey Wilkey, an art dealer, writes:

"... Ezra was always generous in sharing his [research] information and contacts, you could always count on him when there was an issue, a book to look at, a better shipper...
I was surprised and impressed when a friend of mine told me he worked with Ezra at a charity kitchen they both help with, and that Ezra was very active as a worker & donor..."

Rachel Mauro, an art advisor and dealer and friend, writes:

"...I cannot attest to what prompted him to do the things that have now landed him in this predicament, but I can say that I was surprised by the revelations and devastated for him as well as for those he had admitted to harming. This is not the Ezra I know as a friend, and certainly not the Ezra I have worked with in a professional capacity over these seventeen years. I was, though, not surprised to learn that Ezra took responsibility for his actions, admitted wrongdoing, and has apologized... I am certain that he is wracked with guilt and horrified by what he had done. This is the Ezra I know..."

Manuel Greer, an art dealer, writes:

"I have operated an art gallery for 63 years. I have done one or two transactions with him and always in the most correct manner...

Over the years, Ezra has joined me to volunteer at Gods Love We Deliver most Mondays..."

Edward Stanton, a businessman, writes:

"... His character has been lucidly reflected in his global business dealings, high

26

quality moral life in his role as a father and devoted family man, and his uncompromising loyalty to his friends and those is need, that is truly heartfelt.

"I too, have made some serious mistakes in my life, but Ezra's love and understanding and non-judgmental attitude, has helped me personally survive ... He gave me dignity..."

Susan Seidel, an art advisor and dealer, writes:

"... The person I know is not the person who committed this crime; the person I know has a joy in life which he loves to share with generosity of spirit (including, by the way, volunteer work which he does almost sub rosa – this was not a bragging opportunity to show do-gooded-ness)."

Yaacov Abergel, CEO of Aberart, writes:

"... Ezra has already admitted his mistakes... I am asking you to take into account, before sentencing, the person beyond the mistakes he made. ...For me Ezra is a rare example of honesty and kindness in the guild of Art dealers.  A benevolent person who puts the interests of others before his own..."

Adam J. Lerner, Director of the Museum of Contemporary Art Denver, writes:

"... I have known Mr. Chowaiki personally for over twenty years... I understand his actions resulted in harm to others, but knowing his personality, I find it impossible to believe he ever initiated any business interaction with harmful intentions.  I can only imagine that his oversized optimism clouded his judgment and let him to believe that he would make good to everyone in the end..."

Richard Johnsen, an art dealer, writes:

"... I did want to make known to you that the person who will be standing in your courtroom during September is someone who does indeed possess many genuine qualities that are the antithesis of the present serious legal consequences. Being a private art dealer myself since the 1980's... may I categorically state that Ezra was one of the few individuals who I could trust... Ezra was known throughout the fine art world as being a most stellar individual.

Benjamin Sontheimer, an art collector and financial investor, writes:

"When I first met Ezra in 2009, I was in the throes of a personal crisis: divorce, failing business, exiting a multi-floored Fifth Avenue office space, litigating with banks, selling prized possessions... A close friend and seasoned art collector recommended Ezra as 'one of the good guys' – ethical, resourceful discreet...  If

you speak to 100 people about Ezra, you will hear 100 versions of the same basic story.  His immediate and lasting impression are the same: empathetic, likable, generous (to the point of seeming vulnerable to his instinct to be generous) and memorably funny.

... I write this letter to convey something of Ezra's generosity of spirit and essential goodness with the hope that you weigh these large aspects of his character as a counterbalance to the financial misjudgments he made in duress."

David Chowaiki, his brother, writes:

"... He is a very good brother to me and was always there to help me. Growing up as his youngest brother I looked up to him and he was always protective of me. He was extremely generous... and I owe a lot of my recovery from a very dark place in my life to him for his love, support and understanding."

Lewis Black, a businessman, writes:

"... I am not an expert in the law nor can I pretend to understand all the factors that a Judge must consider, but I can say that Ezra has always demonstrated to me and to others around me that he is a quiet and humble person who has a big heart in making amends for his mistakes..."

Gerard L'Ecuyer, a television director and writer, writes:

"... This is a good man, good friend, good father and upstanding human being. ... Ezra's professionalism and character are what he built his career on. I have no doubt he will rebuild his life using these same inherent qualities."

Eyal Levy, a businessman and friend, writes:

"... Ezra was my mentor in the art business... What he did or did not do is not for me to judge, as I don't have the knowledge of the facts, however I can discuss into length Ezra the person that has good heart and soul...

...His community work such as serving food for the poor in Tribeca is not known to many, as he is humble about it.  The money that he donated throughout the years to charities is also not known as he did it for them and not for his benefit..."

Sonja Abracen, an art dealer, writes:

"... my partner and I lost all of our money in the dot.com bubble.  I remember most people turning their back and forgetting what is important in life.  Ezra was one of the few who stood by us and who never judged a person by their personal

circumstances.

... I have no doubt that Ezra has the ability to change and grow and learn from any mistake he made.  In other words given a chance he will take this new lease on life as an opportunity to give back to not only his family and close friends but to society at large..."

David Contorer, CEO of Hebrew Free Loan of Metropolitan Detroit, a non-profit organization, writes:

"... I do not know his professional world, but I see that Ezra is the type of person who would learn from his mistakes to be a better man with repentance.
I hope you will please consider a degree of leniency toward his sentence, as I believe that Ezra will use this time to re-invent himself to be a better individual, father and community member when the time comes to re-enter society."

Lawrence B. Benenson, a real estate developer and art collector, writes:

"...The current situation is an aberration.  He is extremely ashamed, embarrassed and regretful. I am certain he will not behave so financially irresponsible in the future.  Ezra Chowaiki is no threat to society. Please be lenient."

Peter W. Emblad, an emergency room physican, writes:

"... [I] have known him for almost 35 years... [H]is longterm reputation was built as a man of character by his actions and by the ways he spoke about others... Too often, we judge people's characters by their actions, when often it is the circumstance that led to someone acting out of character... I know him too well to know he would not normally do anything immoral, illegal or unjust...I implore upon your good judgment to see him as a good man that may have made a mistake, and allow him the opportunity to learn from his mistakes, make reparations, and continue to contribute to the world in a positive way, rather than simply punishing him..."

Dr. Jaffa Bella Levy, an art dealer, writes:

"... I can only comment on his character as being an extremely good hearted and caring person.  Someone you can really rely on to be there when you need him, always ready to help.
...He is one of the most likable, admirable and knowledgeable people in the Art's business... I have friends calling him 'Golden', because of his honesty to his peers and colleagues.

... I am hopeful that your honor will be able to see and feel his character beyond

the error line."

Nadia Chowaiki Nahmad, his mother, writes:

> "... Ezra has always been very loving and caring to our family.  He was always the
> first to help in any problem with his generosity and kindness.
>
> ... I believe as his mom, Ezra was trying to climb out of a hole that he didn't have
> the business sense to get out off (sic).  I think he is very embarrassed."

The letters quoted here, along with similar sentiments echoed in11 other letters attached

as part of Exhibit E, display many examples of Mr. Chowaiki's good character, sincere remorse,

and history of kindness towards others.  They are a far better measure of his character than the

crimes to which he stands convicted. He is not beyond redemption.

As noted in *United States v. Adelson,* 441 F. Supp. 2d 506, 513-514 (2006),

> "But, surely, if ever a man is to receive credit for the good he has done, and his
> immediate misconduct assessed in the context of his overall life hitherto, it should
> be at the moment of his sentencing, when his very future hangs in the balance.
> This elementary principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice, was plainly part of
> what Congress had in mind when it directed courts to consider, as a necessary
> sentencing factor, 'the history and characteristics of the defendant.'"

**K. Punishment and Deterrence**

As noted above and in the PSR, Mr. Chowaiki has been deterred, he is highly unlikely to

commit any such act again.  Since a person's reputation is integral to success in the high-end art

world, Mr. Chowaiki is unlikely to work again in the specific niche which he so loved. He is

unlikely to ever commit this type of crime again.

Probation notes "The defendant appears to pose a low risk of recidivism."  (PSR at 29)

Probation also notes: "...[I]t s our belief that a 36-month term of imprisonment is a

reasonable sentence in this case, as it would address the sentencing objectives of punishment and

deterrence." *Id.*

As noted in *United States v. Adelson,* 441 F. Supp. 2d at 514, "...there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders."

## IV.  GUIDELINE SENTENCE DISCUSSION

The base offense level for a violation of 18 U.S.C. §1343 is 7 since the statutory maximum sentence is 20 years (see USSG § 2B1.1). Coupled with a loss amount of $9,540,370[12] then pursuant to §2B1.1(K), a 20 level increase is added.  After deducting 3 levels for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b), the parties calculate Mr.Chowaiki's adjusted offense level as 27, less 3 levels for accepting responsibility pursuant to 3E1.1(a) and (b), leaving a total offense level of 24.

Mr. Chowaiki is in Criminal History Category ("CHC") I, which yields a guideline sentencing range of 51-63 months (PSR ¶ 101).

## V.  A REASONABLE SENTENCE

Pursuant to the factors set forth in 18 U.S.C. § 3553 (a), Mr. Chowaiki submits that, standing alone, the very language of Section 3553 (a), which states the Court shall impose *"... a sentence sufficient but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection...*[3553(a)]*"* is reason to sentence him to no further period of incarceration, so long as other appropriate conditions of Post Release Supervision are imposed.

## VI. CONCLUSION

---

[12]As calculated now, the loss factor is merely $40,000 over the level of $9.5 million. See USSG 2B1.1(b)(1)(K).

All of the letters submitted in support of Mr. Chowaiki reflect a consistent theme: this is a good man, a very good man, who made a terrible mistake, for which he is overcome with remorse and sorrow for himself and others who he harmed. He is ashamed, embarrassed, yet determined to find a job where he can pay people back.

His actions in this fraud consistent were the product of a perfect storm: psychological issues, bad business decisions, being victimized by his former business partner, a belief that he could "borrow from Peter to pay Paul" in which Mr. Chowaiki deluded himself, justifying his actions to himself that he would pay it all back, as well as the financial nuances of this high-end art world. "If only ..."

Mr. Chowaiki immediately accepted responsibility for his crime, offered to assist the Government, and ultimately, provided assistance to certain "victims" in this case.

He does not seek to blame others. He has struggled, crashed, and burned and now, recognizing that he will be punished, seeks an opportunity to atone. He has spent a lifetime demonstrating that he earned the right to request mercy because he has proven to be soulful and dispensing of consideration to so many others.

Unlike many criminal defendants, he has embraced this case as an opportunity rather than view it as an apocalypse.

A sentence of one year and one day followed by a period of supervised release of up to three years, conditioned upon his continuing to receive counselling would be appropriate and just.

## VII.   REQUEST FOR DESIGNATION

We respectfully request that the Court recommend that, if appropriate, the defendant be

32

designated to the satellite camp at FCI Otisville to facilitate family visiting and to accommodate his religious dietary needs.

Thank you for your consideration in this matter.

Very truly yours,

Daniel S. Parker

cc:

AUSA D. Tracer
(by email)

33