I9rWchoS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                            18 Cr. 323 (JSR)

5   EZRA CHOWAIKI,
                                            Sentence
6              Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            September 27, 2018
9                                           12:00 a.m.

10

11  Before:

12

13                      HON. JED S. RAKOFF,

14                                          District Judge

15                      APPEARANCES

16  GEOFFREY S. BERMAN
         United States Attorney for the
17       Southern District of New York
    BY:  DANIEL M. TRACER
18       Assistant United States Attorney

19  PARKER & CARMODY, LLP
         Attorneys for Defendant
20  BY:  DANIEL S. PARKER
         CHRISTINA S. COOPER
21       -and-
    GALLET DREYER & BERKEY, LLP
22  BY:  ROGER L. STAVIS

23  Also Present:  Elizabeth Massey, Senior Law Clerk

24

25

I9rWchoS

1              (Case called)

2              MR. TRACER:  Daniel Tracer, for the government.  I'm

3    joined by our office's senior law clerk, Elizabeth Massey.

4    Good afternoon, your Honor.

5              THE COURT:  Good afternoon.

6              MR. PARKER:  Good afternoon, your Honor.  Daniel

7    Parker, appearing on behalf of Mr. Chowaiki, along with

8    Christina Cooper, from my office, and Roger Stavis, who is

9    representing Mr. Chowaiki in related civil proceedings.

10             THE COURT:  Good afternoon.

11             We're here for sentence.  The probation office has

12   calculated the total offense level as 24, the criminal history

13   category as I, and therefore, the guideline range, which is not

14   binding on the Court but which the Court must consider, is 51

15   to 63 months.

16             I take it the parties are agreed that is the guideline

17   calculation.  Yes?

18             MR. TRACER:  We agree, your Honor.

19             MR. PARKER:  Yes, your Honor.

20             THE COURT:  Very good.

21             The probation office recommends a sentence of 36

22   months.  Defense counsel recommends a sentence of a year and a

23   day, and the government asks for a sentence around the

24   guideline range.  As usual, total agreement.

25             Let me hear first from defense counsel, then from

I9rWchoS

1    government counsel, and then from the defendant, if he wishes

2    to be heard.

3          MR. PARKER:  On behalf of Mr. Chowaiki, your Honor, I

4    know, because I know your Honor has read and is very familiar

5    with all of the facts and circumstances of the sentencing

6    submission on behalf of both parties, so I'm going to just

7    highlight what I think are some salient points, which I would

8    urge the Court to consider.

9          The first thing I would like to just emphasize is that

10   sitting next to me, the defendant in this case, is a very, very

11   good person who made some very serious misjudgments and errors,

12   for which he is truly sorry and has exhibited remorse from the

13   inception of this case.

14         Your Honor is aware, as you just said, that probation

15   is recommending a sentence less than the guidelines.  I would

16   say that this Court has been in the forefront of courts

17   recognizing that guidelines sentences are not necessarily a

18   measure of a person's culpability, and I would say that this

19   Court has been at the forefront of recognizing that not only in

20   this building but perhaps nationwide.

21         I think that it is important to understand that the

22   loss factor in this case, which has driven the guidelines to

23   these high numbers, is something that is really not indicative

24   of the level of Mr. Chowaiki's criminal conduct.

25         THE COURT:  I agree with that totally in the sense

I9rWchoS

1    that I agree with the first part of what you said, which is

2    that the loss guidelines are among the more bizarre features of

3    the sentencing guideline regime.  It is amazing to me how much

4    they distort the situation that the Court confronts, not just

5    in this case but in innumerable cases, so you don't need to

6    spend more time about the guidelines.  I'll hear from the

7    government, of course, but subject to their changing my mind,

8    the guidelines are, in my view, not very important in this

9    case.

10          What I am concerned about are two things that you

11   might want to respond to.

12          The first is that some of the effects of this fraud

13   had fairly devastating effects.  I'm thinking particularly of

14   one of the victim impact statements that we got.  It was from

15   Dr.  Bogomila Welsh-Ovcharov, who, in effect, alleges that the

16   fraud, as perpetrated on her, not only caused her tremendous

17   economic harm but emotional harm as well.

18          The second issue that you might want to address is

19   that one gets the impression from this and other cases, and the

20   government, I think, made reference to this in their papers,

21   that the art markets, so to speak, are very poorly regulated,

22   if at all, which places, perhaps, a greater burden on the Court

23   in terms of general deterrence than it might otherwise be

24   called upon to consider.

25          I'm happy to hear, of course, everything else you

I9rWchoS

said.  I've read the many letters you submitted.  They all
attest to the overall good character of the defendant.  They
are important to the Court, very important to the Court.  I
always think that when it comes to sentencing, the singlemost
important question for the Court is the nature of the human
being I have before me, and I think you have shown in those
letters that outside these terrible events that led us to
today, he has conducted himself with considerable honor.  There
were even two letters from victims who nevertheless felt that
they had to attest to his good character.

          All of that I take -- again, subject to hearing from
the government -- as well established, but I'm concerned more
about the other issues that I just mentioned.

          MR. PARKER:  Addressing the two issues of your Honor's
immediate question, one is the victim impact letter from
Ms. Bogomila Welsh-Ovcharov.

          THE COURT:  There were three impact letters, but this
is the one that was most on point.

          MR. PARKER:  Yes, and as I said in my sentencing
submission, that letter is not what I would submit is
indicative really of who Mr. Chowaiki is in terms of his entire
persona, history and character, and that letter is the one
that, like your Honor, affected him the most, for which there's
no doubt that he is extraordinarily remorseful and upset.

          Fortunately, I believe, and I've conferred with the

I9rWchoS

government, that of the 23 paintings at issue in this case, 18

are either in the government's possession or control, or

certainly they're in the process of securing them.

THE COURT:  I assume they're all hanging on the

assistant's wall right now.

MR. PARKER:  I won't comment, but I've seen

Mr. Tracer's office, and it looks like it's decorated --

THE COURT:  More spartan.

MR. PARKER:  It looks like it's decorated in a little

bit more institutional art.

But I believe that the artwork belonging to this

particular victim is artwork that will be ultimately returned

to her.  While that doesn't excuse his conduct with respect to

her, it does provide some means for the Court to say that she

is in all likelihood to get that artwork back when this sort of

mess is cleared out.

In terms of the Court's second concern about the

unregulated artwork in general, I think that, of course, is a

very legitimate concern, but at the same time, one, this isn't

the case where, as the government cites in its sentencing memo,

people engaged in fraudulent art transactions for three, six,

etc., from the inception.

So when you're evaluating what is a proportional

sentence, which I think both parties agree is important for the

Court's consideration, the proportionality of what he did

I9rWchoS

1    relative to what people who received a sentence, let's say,

2    from Judge Kaplan of 41 months, where, for nine years, someone

3    sold fake art, that's something that is intended from the

4    beginning, to steal property from people.  And that's not what

5    Mr. Chowaiki did in this case.

6             And nothing I say -- I'm not saying anything that

7    should be viewed as his denying his responsibility for this or

8    in that vein, but there is a difference, at least in my

9    opinion, as to someone who intentionally engages in fraudulent

10   conduct from the inception and does it over and over, and then,

11   when confronted, lies about it with the FBI, etc., as opposed

12   to this person, who ran a legitimate, well-respected business,

13   and for reasons set forth in my memo, engaged in conduct for

14   which he's truly sorry.  And then when everything came to a

15   halt, he not only voluntarily tried to offer assistance to the

16   government to help clean up the mess, but he ultimately

17   provided assistance to, for example, another victim in this

18   case by setting forth his art expertise.

19            And he remains, as the prosecutor knows, because we

20   had telephone calls in which we voluntarily said, We will help

21   you identify, and we did.  We offered, and we said, This is

22   where this artwork can be located.  This is not a person who

23   did anything other than try to right the wrongs that he

24   regrets.

25            In terms of what your Honor said about -- I've been

I9rWchoS

1    told; I've never been a judge -- that judges view sentencings

2    as one of the most challenging and difficult things that they

3    have to do.

4          With that in mind, your Honor has said that you view

5    the person as the critical factor.  And emphasizing the history

6    and character of this human being, I think that I've outlined

7    in my sentencing submissions not only who he was, not only all

8    the letters about what an extraordinary person he was, the fact

9    that there is a courtroom filled with people here today

10   demonstrating their commitment and support of him, to emphasize

11   to your Honor, in a way saying, Please exercise your judgment

12   in a reasonable way, recognizing that he's going to be

13   punished.  But it's not just his extraordinary character and

14   the support of loved ones, but it's the psychological issues

15   that affected his judgment, which were documented, which make

16   sense in explaining his behavior here and, again, followed by

17   his postarrest conduct, which I would submit is mitigation.

18         In terms of the proportionality that I've addressed, I

19   think it was Judge Learned Hand who may have expressed the

20   importance of a judge exercising sentences that are

21   proportional and relevant in evaluating a person's criminal

22   culpability.

23         THE COURT:  I think we can take it as a given if there

24   is anything worth quoting ever said, it was said by Learned

25   Hand.

I9rWchoS

1          MR. PARKER:  I think that's right.

2          There are defense attorneys who submit sentencing

3     submissions asking for what they think, what they really

4     believe is not a reasonable sentence but on the low end,

5     knowing the government is going to come in, pursuant to policy,

6     and recommend guidelines or on or about guidelines, and I'm

7     hoping that the Court will --

8          THE COURT:  Mr. Parker, it's been my great pleasure to

9     have you before me many times, and one of the reasons is your

10    high credibility.  I was very pleased to see that you were not

11    making a pitch for no jail time, which would have been, I

12    think, unconvincing to the Court, so I appreciate where you're

13    going.

14         MR. PARKER:  I always appreciate your Honor's kind

15    words, but what I would say is that the government asked the

16    Court to impose a substantial period of incarceration.

17         For this man, who's led this life, which brought him

18    to this tragic day in his life, any period, a period of a year

19    incarceration is a substantial sentence for him, and it would

20    represent a terrible, terrible thing that he would have to go

21    through, and he understands that.

22         At the same time, it would serve the general and the

23    specific deterrence that this Court is concerned about.  I

24    think all the factors set forth in 18 U.S.C. 3553 include not

25    only the impact on the individual victims in this case but also

I9rWchoS

the broader schemes of punishment and what it's designed to

achieve, and it is for those reasons that I'm asking your Honor

to impose a sentence of a year and a day.  We submit that it is

reasonable.  It is not more than necessary.  It is completely

appropriate.  It is called for based on his acts, his history,

his character and what transpired in this case.

Thank you.

THE COURT:  Thank you very much.

Let me hear from the government.

MR. TRACER:  Sure.  Thank you.

Good afternoon, your Honor.

I wanted to make three points.  I think two of them

relate to the points I think your Honor rightly focused on in

this case.  One is the harm to the individual art owners that

were defrauded.

Your Honor has seen the victim impact statements,

particularly the one of Dr. Welsh-Ovcharov and the impact that

this had on her.  I think what's significant here is that

people like Dr. Welsh-Ovcharov went to Mr. Chowaiki because he

held himself out as an expert in the field, as someone who ran

a reputable gallery, and it's a significant part of the crime

that was committed here.

One of the reasons I wanted to hand up in advance the

restitution order, which I'll have some additional things to

say about after to your Honor, is just so your Honor can see

I9rWchoS

1    sort of our most up-to-date thinking on the loss amount and the

2    victims here.  It's a loss in excess of $10 million,

3    notwithstanding, I think, the point that defense counsel has

4    rightly made, that works of art are particularly subject to

5    market differences from time to time, so the number is not

6    necessarily always an accurate number, but it's about two dozen

7    paintings, and it is certainly millions and millions of dollars

8    of artwork taken from multiple --

9            THE COURT:  Yes.  There's no doubt that this was a

10   substantial crime when viewed financially.

11           My problem with the guidelines is the gross weight,

12   overweight that they place on loss.  In a typical white collar

13   case, the loss amount is responsible for 70 percent of the

14   calculation of the offense level, and that seems to me totally

15   oblivious to the many other factors that any reasonable court

16   should take into account in this very sensitive area of

17   sentencing.  But I don't suggest for a moment, and I don't

18   think defense counsel suggests for a moment, that this wasn't a

19   substantial fraud, on any possible view of it.  Whether it was

20   9 million, 12 million, whatever, it was a lot of money, a lot

21   of fraud and involving a long period of time.

22           MR. TRACER:  We understand that, your Honor, and I

23   think that your Honor has certainly been very public about that

24   opinion.

25           To that point, I should say that the government

I9rWchoS

1    doesn't think that a sentence -- and I say approximately the

2    guideline range here.  It is not because it is the guidelines

3    range here.  It's because of the other factors, and this is a

4    good segue to the other points about, I think, the general

5    market issues here as well as what we flagged for your Honor as

6    some data points, understanding that no comparison is perfect,

7    and I'll get to those in a minute.

8            In terms of the market, I think, to the second point

9    your Honor made, the art market is a particularly vulnerable

10   market.  And in particular in this case, and we quoted some of

11   the language in our brief -- I don't mean to compare the

12   defendant to another defendant that your Honor sentenced, Marc

13   Dreier, but I do think some of the sentiments that your Honor

14   expressed in some of the opinions dealing with the forfeiture

15   aspect of that case are apt in this circumstance.

16           We have a case where, because of the hard work of the

17   FBI, most of the paintings were recovered in this case, and

18   they are now -- just for your Honor, they are not in my office.

19   They are at a storage gallery called Day & Meyer on the Upper

20   East Side, which is a reputable art institution, and we do

21   have, therefore, most of those paintings.

22           As it turns out, we don't have the one that is the

23   subject of Dr. Welsh-Ovcharov's claim, but nevertheless, we do

24   have most of them.  But the process of getting them back to

25   their owners will not be simple.  As your Honor has seen on the

I9rWchoS

docket, there are multiple claims to almost every painting, and that's something that I'm sure we will take up in due course with the Court, but it's one of the effects of fraud and, again, ought to be taken into account here.

The third points I'll make, unless your Honor has any questions, is just some of the comparison points we felt were appropriate for your Honor.  We looked at some of the art fraud cases that have been brought and sentenced in this district over the last few years.

In the John Re case, Judge Castel sentenced him to 60 months in prison.  Granted, the scheme lasted over a longer period of time; it was a nine-year scheme involving over $2 million of loss, so the loss amount there is less, whereas it's more here.

I certainly agree with Mr. Parker that it is a different crime selling fake art versus defrauding people of their real art.  In terms of which one's worse, it's hard to say, and it depends on the circumstances, but I do think it is a sort of relevant point of comparison in a case like this.

Likewise, Judge Kaplan sentenced a defendant named Spoutz to 41 months in prison, also for selling fake art, so in that sense different than this case, but in a scheme that involved about 1.5 million in loss.  And so when you see numbers like those, I think, and our guideline range here being in the 50- to 60-month range, it appears as if that sentence is

I9rWchoS

within the sort of norm for sentences imposed on relatively

comparable defendants within this district, under similar

circumstances.

THE COURT:  The difficulty I always have with those

kinds of comparisons hearkens back to the point I made to

defense counsel.

There is, in this Court's view, a huge difference

between someone who is a basically good person, conducts his

life in an honorable fashion and even laudable fashion, and

nevertheless, for economic-pressure reasons or otherwise, is

led into very serious criminal activity versus someone who is

heedless of other people, who spends his life as a living

fraud.  I hate to say it, but that was true of Marc Dreier, and

it was one of the reasons I imposed such a high sentence in

that case.

To me, it still comes back down -- it's not the only

factor, of course; I have to consider all the factors under

Section 3553(a), and they're all important -- but to me, the

factor that weighs very heavily is the nature of the human

being before me.

The defense suggestion is that unlike, perhaps, some

of the people you're referring to in those other cases, though

I don't know that much about the nature of the human beings

there, here we have an essentially good man who did a very bad

thing.

I9rWchoS

1          Do you disagree with that?

2          MR. TRACER:  We don't, your Honor.  We don't dispute

3     that the factual circumstances -- and I think it is

4     significant, I will say that his acceptance of responsibility

5     was very quick and fulsome in this case.  I do not dispute

6     that.

7          THE COURT:  OK.  Anything else you wanted to tell me?

8          MR. TRACER:  No, your Honor.

9          THE COURT:  Thank you very much.

10          MR. PARKER:  Before you hear from Mr. Chowaiki, may I

11     very briefly respond?

12          THE COURT:  Yes.

13          MR. PARKER:  And I appreciate the government's

14     acknowledgement that Mr. Chowaiki accepted responsibility

15     quickly, because he did, and the parties knew that.

16          I would just remind the Court, in my reply memorandum,

17     I set forth the factors of the relative culpability of the

18     individuals who the government references, specifically,

19     Mr. Spoutz, who was sentenced by Judge Kaplan, who did engage

20     in this for, intentionally committed fraud for a long period of

21     time and then lied to the FBI, etc., as well as Mr. Re, who was

22     sentenced by Judge Castel, who had a lengthy criminal history,

23     and apart from everything else, basically, even at sentencing,

24     denied his acceptance of responsibility and sort of, what I

25     submit, was dishonest with the Court representing where the

I9rWchoS

1   proceeds of that had gone to.

2          In terms of evaluating the relative culpability of

3   Mr. Chowaiki, that's just something I want to remind your

4   Honor.

5          THE COURT:  Thank you very much.

6          Let me hear from the defendant if he wishes to be

7   heard.

8          THE DEFENDANT:  Thank you, your Honor.

9          I'm a little nervous.

10          Over the last year, I've tried very hard to figure out

11   how it is that I ended up doing what I did.  For so long, I

12   built a business based on integrity, scholarship and

13   professionalism.  Lying and scheming were antithetical to my

14   company.  And for many years, even through difficult

15   circumstances, I adhered to those core values.

16          This is why it's so hard for me and for the people

17   that know me to understand why I allowed myself to do something

18   so terrible.  Why did I let my brain take a wrong turn?  Why

19   did I allow myself to make the biggest mistake of my life?

20          I want to be clear.  What I did -- all my actions --

21   were wrong.  I'm not someone without morals.  I know right from

22   wrong.  So why did I do it all?

23          The short answer, which is by no means an excuse, is I

24   got desperate.  My company had suffered such bad hits, not just

25   in recent years but for years prior.  I trusted people that I

I9rWchoS

1  should not have trusted, but just as bad, I trusted my own

2  flawed instincts.  In times I should have been cautious, I went

3  ahead with decisions that were, in hindsight, foolish and which

4  made my company lose money.  Some of these losses were within

5  my control and some were not, but what was absolutely in my

6  control was how I tried to rectify these losses.  I did that by

7  lying and defrauding people, and the most abhorrent part of it

8  for me is that some of these people were my friends and people

9  who trusted me.

10         I still do not understand how I could do such a thing,

11  but I did.  And even if mental health issues are involved, I do

12  not want to hide behind any of that.  I take full ownership of

13  my actions.

14         I will say that I never meant to hurt anyone.  In

15  fact, I was foolishly hoping that I could move things around to

16  keep my company afloat long enough for me to conclude a large

17  enough deal or two to bail me out.  I was reckless with other

18  people's money and property, and I deluded myself into thinking

19  that I could keep everyone in the dark until that elusive big

20  score.  I'd had big successes before, and I hoped to be able to

21  reimburse those who I had taken from.  Of course, this is

22  wrong, not just because those big deals cannot be counted on,

23  but because I was using someone else's money and property, and

24  trust, trust that took me years to build.

25         I cannot be more sorry.  Many people felt betrayed by

I9rWchoS

me, and I truly feel I did betray them.  Many people who

vouched for me or introduced me to others, for example, may not

have suffered direct losses but were nevertheless adversely

affected by my actions towards the people to whom they

recommended me.  And they are victims too.

My children have been affected.  They have had to deal

with humiliation and shame; my ex-wife too, and my friends, my

brothers, my mom.  Just considering this is almost too much to

bear.

To all those people -- my victims -- both direct and

indirect, I would like to apologize.  To my victims, I am so,

so sorry for how I lied and misled you.  I am so sorry for

mistreating you like this.  To my indirect victims, I'm sorry I

misused your trust in me.

Over the last year, not only have I been shamed and

shunned and excommunicated, I've lost my career and livelihood.

I've had to rely on friends who have graciously housed me and

supported me, something which has made me grateful and ashamed.

And probably most tragically, I have ruined my relationship

with my children.  I hope in time that they, like others, will

be able to forgive me and I can repair relationships that I've

so badly damaged.

I would have ended my remarks here, but my friends

have advised me to say some things to hopefully illustrate for

you who I am.  I must say I'm exceedingly uncomfortable

I9rWchoS

1    pointing out these qualities, especially because I do not feel

2    much pride anymore.

3         I'm a charitable person.  I have given all my life,

4    not just money but those more elusive assets, time and effort.

5    I, along with my ex-wife and kids, for many years have welcomed

6    inner city kids to live with us months at a time.  During all

7    that time, I -- we -- have remained involved in their lives.

8         I have actively participated in charitable

9    organizations like Ronald McDonald House, the Special Olympics

10   and, most recently, God's Love We Deliver, where I have

11   volunteered throughout the last year.  I truly hate that I have

12   to enumerate these activities in an effort to seek leniency.  I

13   never did them for points or recognition.  In fact, I hardly

14   told anyone about them.  I mention these things because I want

15   you to know who I am, a good person who did terrible things,

16   for which I cannot be more sorry.

17        I hope to be able to pay back the people who I have

18   harmed, not just financially but emotionally.  I intend on

19   spending the rest of my life paying them back and to rebuild my

20   reputation which I worked so hard to build.  I'm gratified that

21   all -- or most -- of the works will be returned to their

22   rightful owners.  I am thankful that the FBI will do what I

23   could not do.

24        People say that all this will be over one day.  I

25   truly hope so, because right now, I cannot imagine it ever

I9rWchoS

1    will.

2              Thank you for giving me the opportunity to address

3    you.

4              THE COURT:  Thank you very much.

5              I think the Court has already identified the factors

6    that I think are particularly prominent in this case.

7              On the one hand, this was a substantial fraud, carried

8    out intentionally, knowingly, willfully over a prolonged period

9    of time.  On the other hand, everything else in the defendant's

10   character is positive.  The statement he just made confirms in

11   the Court's own mind the good qualities that he exhibited over

12   a great deal of his life.

13             Always the hardest question, or among the hardest

14   questions, for any court in imposing sentence is the question

15   of general deterrence.  Sociologists have attempted to study

16   this, without, frankly, much success.  We know the extremes.

17   We know that life imprisonment has a greater deterrent effect

18   than three months of imprisonment, but we don't know much

19   beyond that, from a scientific or sociological standpoint.

20             There is some data that suggests that with respect to

21   white collar crimes, an absence of any imprisonment has a

22   negative effect in terms of general deterrence, that it doesn't

23   achieve general deterrence, but that modest imprisonment has a

24   greater impact in this area than it does in some other areas of

25   criminality.  But all of this is soft and is not well

I9rWchoS

established.

Sometimes general deterrence, frankly, can be just an excuse for a court to say that they really want to impose a heavy sentence in order to "send a message."  I'm not suggesting that that is the intent of those judges who say that, but I am suggesting that it does not grapple with the moral question of what is sufficient to send a message, but no more than necessary, in terms of punishing the human being in front of the court.

Counsel is quite right.  All judges find sentencing to be extremely difficult, and not just because of the humility with which any human being should approach imposing anything as harsh as imprisonment on any other human being but also because of the difficulties in finding what is the right sentence in the Court's view.  I don't want to spend too much time on the sentencing guidelines, because that's not the heart of this sentence in any respect.

The guidelines, in this Court's view, are a foolish attempt to relieve judges of that difficult burden they face through a totally artificial and often irrational numbers game, and in my view, it's just an evasion of judicial responsibility.

One factor that does loom importantly for the Court in this case is the somewhat unregulated -- "somewhat" may be the wrong adjective -- the seemingly unregulated nature of the art

I9rWchoS

market.

Here, we have something that, by its very nature,
calls for expertise and knowledge and can easily be the subject
of fraud, and yet, it seems to operate without any meaningful
constraints except those imposed by the character of the
persons involved in it, so I think that does weigh modestly in
favor of a higher sentence.  But on the other hand, the very
cases that the government cites, as further elucidated by
defense counsel, will illustrate how different those cases are
from this case.

This is not a case of the kind of forged art, for
example, or a total sham entity set up for the purpose of
committing financial fraud, or the like.  I'm going on at such
length because I find this a particularly difficult sentence,
but in the end, I think that Congress was very wise when it
instructed the courts to sentence a defendant for the term of
imprisonment sufficient to carry out the various functions of
sentencing, as set forth in Section 3553, but no more than
necessary for that.

This is the Occam's razor of sentencing, and it makes
a lot of sense to me, so while I worry a little bit that this
sentence may be, in this Court's view, a little too lenient,
I'm going to impose an 18-month sentence.

The sentence of the Court is that the defendant is
sentenced to 18 months in prison to be followed by three years

I9rWchoS

1      of supervised release under terms I'll get to in a moment.

2             No fine will be imposed because there will be a very

3      substantial restitution, which we'll talk about in a moment.

4             There is, however, a mandatory $100 assessment that

5      also must be paid.

6             The terms of supervised release are, first, the

7      mandatory conditions that the defendant must not commit any

8      other federal, state or local crime;

9             That the defendant must not unlawfully possess a

10     controlled substance.

11            The drug-testing condition, however, will be suspended

12     based on the Court's determination that the defendant faces a

13     low risk of future substance abuse.

14            However, the further mandatory condition, that the

15     defendant cooperate in the collection of DNA, will be imposed.

16            There will also be imposed the standard conditions of

17     supervision, 1 through 13.  They appear on the face of the

18     judgment and will be gone over with the defendant by the

19     probation officer when the defendant reports to begin his

20     period of supervised release.

21            And then there are the special conditions, but before

22     we turn to the special conditions, I have the proposed order of

23     restitution in the amount of $12,899,980.

24            Is that order a consent order?  Do both sides agree to

25     that or not?

I9rWchoS

1          MR. TRACER:  I believe the defense has agreed to that.

2          MR. PARKER:  We have, but we have also, I think, a

3    joint application with respect to the order of restitution, and

4    so I'll let Mr. Tracer make that application.

5          THE COURT:  OK.

6          MR. TRACER:  Sure.

7          Your Honor, we do agree with it.  Your Honor has the

8    ability to delay restitution up to 90 days, and perhaps more,

9    if the defendant agrees.

10         This restitution order has some unique provisions in

11   it, and in particular, this provision about if the work goes

12   back to the particular victim, as spelled out in paragraph 1,

13   the restitution -- essentially the defendant gets credited for

14   that.  The forfeiture order in this case works similarly.

15         Because we do think there is some work to do in terms

16   of sorting out the ownership of the paintings, we would propose

17   that the Court hold off on entering this order, because those,

18   as I'll get to in a moment, those sort of proceedings, the

19   ancillary proceedings may result in, by settlement, we think,

20   many of the paintings --

21         THE COURT:

22         That's fine.  Forgive me for interrupting.  I'm happy

23   to do that for the 90 days.  I'm not happy to do it for more

24   than that, so don't come back and ask for more.  Whatever you

25   can do in 90 days, fine.  Otherwise, work it into the order, as

I9rWchoS

1   you already have, that there are future credits that may be

2   applied, but I don't want to leave this hanging beyond 90 days.

3            MR. TRACER:  Thank you.

4            THE COURT:  The special conditions of supervised

5   release are, first, that the defendant must provide the

6   probation officer with access to any requested financial

7   information;

8            Second, that he must not incur any new credit charges

9   or open additional lines of credit without the approval of the

10  probation officer unless he is in compliance with the

11  installment payment schedule.  Although we don't have the

12  amount yet, the installment payment schedule will be 15 percent

13  of the defendant's gross monthly income beginning with the

14  second month of supervised release.

15           Finally, the last special condition is that the

16  defendant must report to the nearest probation office within 72

17  hours of his release from prison, and he will be supervised by

18  the district of his residence.

19           Now, before I advise the defendant of his right of

20  appeal, we need to know about surrender date and also anything

21  else counsel wants to raise.

22           Anything else from the government?

23           MR. TRACER:  I would like, your Honor -- I think this

24  is the right time to do it -- to raise the issue of sort of

25  sorting out these additional claims.  I can do that now or we

I9rWchoS

```
1    can wait until after.

2              THE COURT:  No.  I mean, I think we need to set up

3    hearings, but don't you need to have the relevant people

4    present?  Why don't you just do that by giving me a phone call

5    with each of them, and we'll individually set up those

6    hearings.

7              MR. TRACER:  We can do that, your Honor.

8              If I can give a little context, there are 21 parties

9    that are parties to this, and I have spoken to the trustee, who

10   is here today and has been helpful in this process.  He's

11   actively pursuing settlements with a lot of them, and so one of

12   the things -- and in addition, I should add, I think, before a

13   hearing is held, there would be an opportunity to move to

14   dismiss some of the petitions, which I think we would do if

15   some of the cases don't settle.

16             THE COURT:  Again, forgive me for interrupting, but I

17   want to move this along.

18             I have no problem waiting.  I would say the most I'd

19   be willing to wait is two months.

20             MR. TRACER:  OK.

21             THE COURT:  If he can settle a lot of them before

22   then, terrific.  Great.  After two months, with respect to any

23   open matters, whether it's a matter of moving to dismiss or a

24   matter of having an evidentiary hearing, or whatever, you will

25   need to convene with the Court a conference call with each of
```

I9rWchoS

1   the relevant people for each of those situations on the phone.

2   And we'll set dates for the proceedings.

3          MR. TRACER:  OK.  That sounds -- thank you, your

4   Honor.

5          THE COURT:  Anything from the defense?

6          MR. PARKER:  I believe the government does not object

7   to a self-surrender on this case, so I would just ask the Court

8   to set a date for it.

9          THE COURT:  Yes, let's do that now.

10         MR. PARKER:  I would also ask that your Honor adopt

11  our request that you recommend, to the extent eligible, that he

12  be designated to the satellite camp at FCI Otisville.

13         THE COURT:  Yes, I will certainly recommend that.  As

14  I'm sure you've told your client, I have no power to order it,

15  but I can recommend it, and I will.

16         MR. PARKER:  I've told my client that most courts have

17  no powers but that this Court has unique powers.

18         THE COURT:  Right.  You'd better talk to my wife.  She

19  will disillusion you.

20         Let's get the surrender date.

21         THE DEPUTY CLERK:  Thursday, November 8, by 2 p.m.

22         MR. PARKER:  Would the Court consider a longer date?

23  He's not a flight risk.  He's been completely compliant with

24  his pretrial services officer.

25         THE COURT:  I would consider a later date in November.

I9rWchoS

1    I wouldn't consider beyond November.

2            MR. PARKER:  Does November have 31 days, your Honor?

3            THE COURT:  It only has 30.

4            MR. PARKER:  Then that would be the request.

5            THE COURT:  Friday, November 30, at 2 p.m.

6            MR. PARKER:  In all candor, actually, I'm not sure he

7    will be designated by then.  It takes time.

8            THE COURT:  We factored that into the date we gave,

9    but in our experience, they're able to do it in approximately

10   45 days.

11           MR. PARKER:  November 30 at 2; is that what your Honor

12   said?

13           THE COURT:  Yes.  Obviously, if he hasn't been

14   designated, we'll extend it accordingly.

15           Mr. Chowaiki, you have the right to appeal this

16   conviction.

17           Do you understand that?

18           THE DEFENDANT:  Yes, I do.

19           THE COURT:  This sentence, I should say.  And if you

20   don't have funds to retain counsel for the appeal, the Court

21   will appoint one for you free of charge.

22           Do you understand that?

23           THE DEFENDANT:  I do, your Honor.

24           THE COURT:  Very good.

25           (Adjourned)