```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
---------------------------
UNITED STATES OF AMERICA

              -against-                    18-cr-323 (JSR)

EZRA CHOWAIKI,                             OPINION AND ORDER

              Defendant.
---------------------------
```
JED S. RAKOFF, U.S.D.J.

Ezra Chowaiki, the former operator of an art gallery,
pleaded guilty before this Court to a fraudulent scheme relating
to works of art held by his gallery on consignment. During the
plea proceedings, the Court entered a preliminary order
forfeiting Chowaiki's interest in various works of art that he
acquired as the result of, or that were used to perpetrate, his
fraud. A number of third-party petitioners filed claims
asserting interests in the works of art. The disposition of most
of the contested works has been resolved by settlement.

Before the Court is the Government's motion to dismiss
several petitions insofar as they assert any interest in one
specific painting, Picasso's Le Clown. For the reasons that
follow, the Government's motion to dismiss is granted insofar as
it seeks to dismiss the petitions of the Bankruptcy Trustee and
KS Enterprise LLC. The motion is denied insofar as it seeks to
dismiss the petition of Piedmont Capital LLC.

1

## I.   **Factual Background**

### A.   The Conviction and Forfeiture Allegations

For several years, Ezra Chowaiki operated Chowaiki & Co.
Fine Art Ltd. ("the Gallery"). In 2015, Chowaiki began to use
the Gallery to defraud investors and consignors. Specifically,
Chowaiki would invite investors to send money to the Gallery
that would purportedly be used to purchase artwork for resale.
In fact, however, Chowaiki used that money to pay off the
Gallery's mounting debts. Similarly, Chowaiki would use artwork
held by the Gallery on consignment as collateral to secure new
loans, or in satisfaction of existing, defaulted loans. In
November of 2017, the Gallery filed for bankruptcy. The next
month, a criminal complaint was filed, accusing Chowaiki of the
above-described fraudulent conduct. See ECF No. 1. He ultimately
pleaded guilty to one count of wire fraud on May 3, 2018, and
was sentenced on September 27, 2018 to eighteen months'
imprisonment and three years of supervised release. See
Judgment, ECF No. 76.

At the time of the guilty plea, and on consent of the
parties, the Court entered a preliminary order of forfeiture.
See Consent Preliminary Order of Forfeiture, ECF No. 16. That
Order provided for the forfeiture of various works of art and
also provided that a money judgment in the amount of $16,635,370
would be entered against the defendant, less the value of any of

2

the forfeited works that were actually recovered. Id. at 1-5. The Government published notice of the proposed forfeiture as required by Fed. R. Crim. P. 32.2(b)(6), see Service by Publication, ECF No. 80, and several third-party claimants filed petitions asserting interests in one or more of the paintings. The Government represents that it seeks to determine the rightful owner of the various works, not to keep the paintings for itself. The Court's understanding is that the painting at issue in this motion is the only remaining work that is the subject of contested proceedings. Claims as to the other works have either been settled or are in the process of settling, and the preliminary forfeiture order has been amended several times to vacate references to those works.

The instant motion concerns one painting, Le Clown by Picasso ("the Work"). Four parties filed petitions asserting interests in the Work: Andrew and Kirsten Neuman ("the Neumans"), ECF No. 31; KS Enterprise LLC ("KS Enterprise" or "KS"), ECF No. 47; Piedmont Capital LLC ("Piedmont Capital" or "Piedmont"), ECF No. 57; and Albert Togut, the Bankruptcy Trustee for the Gallery's estate ("the Trustee"), ECF No. 59.

B.    The Third-Party Petitions

1.    The Neumans

According to their petition, the Neumans entered into a consignment agreement with the Gallery on March 31, 2017. Neuman

3

Pet. ¶ 8. The agreement provided that the Neumans would put up the money to purchase Le Clown, while the Gallery would act as their agent in buying and then reselling the Work. Neuman Pet. Exh. A ¶¶ 3, 6, ECF No. 31-1 ("Agreement"). The Agreement further provided that while the Gallery would have physical custody, the Work would be the property of the Neumans, who would also retain "sole discretion" to approve any sale or sale price. Id. ¶¶ 8, 10. The Gallery would be entitled to 15% of any sale price. Id. ¶ 12(a). On April 3, 2017, the Neumans wired the money necessary to purchase the Work to the Gallery. Neuman Pet. ¶ 12. The Neumans subsequently demanded, and regained, custody of the Work in November of 2017. Id. ¶ 14. The Neumans argue in their petition that they held an interest superior to Chowaiki's at all times following the purchase of the Work in April 2017. Id. ¶¶ 22-23, 26.

### 2.   KS Enterprise

KS Enterprise claims in its petition that it agreed to buy Le Clown (and another work, Jellyfish Eyes, not at issue here) from the Gallery on September 8, 2017. KS Enterprise Pet. ¶ 6. KS wired the purchase price to the Gallery on September 11 and took possession of the Work on September 16. Id. ¶¶ 8, 12. On September 25, the Gallery offered KS Enterprise $350,000 to buy back Le Clown and Jellyfish Eyes. Id. ¶ 13. KS agreed, and the Gallery took possession the same day on the representation that

4

payment would be forthcoming. Id. ¶ 15. The invoice from KS provided that "title to the Artwork shall not pass to the purchaser until full payment has been acknowledged to have been received by KS Enterprise LLC." Id. ¶ 16; KS Enterprise Pet. Exh. C, ECF No. 47-3. The Gallery never paid. KS Enterprise Pet. ¶ 20. KS Enterprise claims that it acquired title to the Work on September 11, 2017, which it retained through the subsequent repossession because the Gallery never transmitted payment. Id. ¶¶ 11, 22.

### 3. Piedmont Capital

According to its petition, on September 19, 2017, Piedmont Capital lent $300,000 to the Gallery. Piedmont Pet. ¶ 15; Piedmont Pet. Exh. A, ECF No. 57-1. Certain works of art were pledged as collateral, including Le Clown, which the Gallery claimed to own. Piedmont Pet. ¶ 16(b); Piedmont Pet. Exh. B, ECF No. 57-2. The Gallery defaulted on the loan, and on October 19, 2017, the parties executed a release agreement whereby Piedmont would discharge the debt in exchange for ownership of the collateral. Piedmont Pet. ¶ 20-21; Piedmont Pet. Exh. G ¶¶ 1, 3, ECF No. 57-7. Piedmont claimed to have superior title to the Work as a bona fide purchaser for value. Piedmont Pet. ¶ 28.

### 4. The Bankruptcy Trustee

According to the petition by the Trustee, the Gallery filed for bankruptcy on November 13, 2017. Trustee Pet. ¶¶ 1, 2. In

its petition, the Trustee claims an interest in Le Clown that is superior to all other claimants on the ground that the various transfers of the work constituted avoidable preferences under the Bankruptcy Code. Id. ¶ 28(v). Alternatively, the petition claims that the Gallery retains a 15% interest in the Work pursuant to the consignment agreement. Id.

## C. The Motion to Dismiss

On January 3, 2019, the Government filed the instant motion to dismiss the petitions of KS, Piedmont, and the Trustee. Gov't Mem. Supp. Mot. Dismiss ("Gov't Mem."), ECF Nos. 86, 87. The Government argues that all these petitions should be dismissed for lack of standing and failure to state a claim. Gov't Mem. 7-8. In the alternative, the Government asks that summary judgment be granted in its favor. Id. at 8. The Neumans joined the Government's motion, ECF No. 99, and Piedmont and KS opposed, Piedmont Mem. Opp. Mot. Dismiss ("Piedmont Opp."), ECF No. 98; KS Mem. Opp. Mot. Dismiss ("KS Opp."), ECF No. 101. The Trustee does not oppose the Government's motion, with certain caveats. Trustee Resp. Mot. Dismiss ("Trustee Resp."), ECF No. 96.

## II. Discussion

### A. Legal Standards

#### 1. Forfeiture

Any property "which constitutes or is derived from proceeds traceable to" wire fraud is forfeitable to the Government. See

6

18 U.S.C. § 981(a)(1)(C) (incorporating the definition of
"specified unlawful activity" in 18 U.S.C. § 1956(c)(7), which
incorporates offenses listed in 18 U.S.C. § 1961(1), which lists
wire fraud); see also 28 U.S.C. § 2461(c) (providing for
forfeiture of property subject to civil forfeiture upon criminal
conviction, using the procedures specified in 21 U.S.C. § 853).
Title to such property vests in the United States "upon
commission of the act giving rise to forfeiture." 18 U.S.C.
§ 981(f). Accordingly, "the government's interest in the
proceeds of a fraud vests as soon as those proceeds come into
existence, and is therefore superior to that of any subsequent
third-party recipient of those funds (unless the third party is
a bona fide purchaser for value)." United States v. Daugerdas,
892 F.3d 545, 548 (2d Cir. 2018).[1]

    Third parties claiming an interest in forfeited property
may file petitions requesting a hearing. 21 U.S.C. § 853(n)(2).
Such third-party petitions cannot challenge the predicate
finding that the Government's interest in the property is
superior to the defendant's; they are limited to arguing that
the third party's interest trumps the Government's. See DSI
Assocs. LLC v. United States, 496 F.3d 175, 185 (2d Cir. 2007).

---

[1] Unless otherwise indicated, case quotations omit all internal quotation
marks, alterations, footnotes, and citations.

To carry its burden, a petitioner "must first establish his standing to challenge the forfeiture order by demonstrating a 'legal interest' in the forfeited property." United States v. Watts, 786 F.3d 152, 160 (2d Cir. 2015). "Where the petitioner has no valid interest in the property under state law, the inquiry ends, and the claim fails for lack of standing." Id. at 161 (quoting United States v. Timley, 507 F.3d 1125, 1130 (8th Cir. 2007). "The petitioner must then prove his entitlement to relief on the merits by establishing, through a preponderance of the evidence, one of two superior claims to the property under § 853(n)(6)." Id. at 160. The petitioner can prevail by showing either that he (1) had superior title to the defendant at the time of the act giving rise to forfeiture or (2) was a bona fide purchaser for value of the property and "was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(A), (B). The former provision applies to third parties who had an interest in property before the subject crime was committed (and so before the government's interest vested); the latter applies to third parties who innocently acquire property after the crime. See Watts, 786 F.3d at 166.

## 2. Motions to Dismiss

A court faced with a third-party petition "may, on motion, dismiss the petition for lack of standing, for failure to state

8

a claim, or for any other lawful reason." Fed. R. Crim. P. 32.2(c)(1)(A). "[U]nder Rule 32.2, a motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)." Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004).

"To survive a motion to dismiss, a [petition] must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The factual allegations set forth in the petition are assumed to be true; the legal conclusions are not. Willis Management (Vermont), Ltd. v. United States, 652 F.3d 236, 242 (2d Cir. 2011).

### 3. New York Property Law

"State law determines a petitioner's legal interest in the property at issue." Willis Management, 652 F.3d at 242. Here, the parties agree that the laws of New York State apply. "Sales of artwork are governed by New York's version of the Uniform Commercial Code ('UCC'). . . ." Overton v. Art Finance Partners LLC, 166 F. Supp. 3d 388, 399 (S.D.N.Y. 2016) (quoting Dorothy G. Bender Foundation, Inc. v. Carroll, 975 N.Y.S.2d 708, 2013 WL 4487458, at *6 (Sup. Ct. N.Y. Cty. Aug. 20, 2013).

9

Under the New York UCC, an entrustment of goods "to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." UCC § 2-403(2). "'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether . . . the possessor's disposition of the goods" is larcenous. UCC § 2-403(3); see Galin v. Hamada, 283 F. Supp. 3d 189, 195 (S.D.N.Y. 2017), aff'd 753 Fed. Appx. 3 (2d Cir. 2018) (holding that painting was "entrusted" to art dealer within meaning of UCC, even though sale violated contract with owner).

A buyer in the ordinary course is one who "buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind." UCC § 1-201(9). A person who "acquires goods . . . as security for or in total or partial satisfaction of a money debt" does not qualify as a buyer in the ordinary course. Id.

Unless otherwise specified by the contract of sale, title to goods sold passes upon delivery to the buyer. UCC § 2-401(2). "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." UCC § 2-

10

401(1). The security interest "attaches" when it becomes
enforceable against the debtor. UCC § 9-203(a). However, a
security interest cannot be enforced against the debtor or
against third parties unless "the debtor has rights in the
collateral or the power to transfer rights in the collateral to
a secured party." UCC § 9-203(b)(2).

B.  Application to the Petitions

As an initial matter, the Government has moved to dismiss
or, in the alternative, for summary judgment. Gov't Mem. 1. The
Government has not, however, asked the Court to consider any
"matters outside the pleadings," cf. Fed. R. Civ. P. 12(d), or
otherwise explained why summary judgment would be appropriate.
Nor has the Government supported any part of its argument by
reference to admissible evidence, see Fed. R. Civ. P. 56(c)(1),
(2), or complied with Local Civil Rule 56.1. Therefore, to the
extent the Government moves for summary judgment, that motion is
denied in all respects, without prejudice to such a motion being
properly brought following the close of discovery. See Pacheco,
393 F.3d at 352 (stating that, in ancillary forfeiture
proceedings, "[o]nly after some discovery has taken place may a
party move for summary judgment").

1.  The Trustee's Petition

The Government argues that the Trustee lacks a cognizable
interest in the Work itself. Rather, according to the

11

Government, the Trustee has at most a contractual claim for money damages (in the amount of 15% of any sale price of Le Clown) against the Neumans. Gov't Mem. 20. The Trustee, in its response and at oral argument, conceded this point. Trustee Resp. 2-3; Tr. Feb. 7, 2019, at 7:6-11. The Trustee further represents that it has reached a settlement with the Neumans and asks only that the Court's order not "extinguish or otherwise prejudice" that agreement. Trustee Resp. 3.

The Court agrees with the parties that the Trustee lacks a cognizable interest in the Work for the purposes of forfeiture. Although the Trustee's interest is related to Le Clown, it is an entitlement to money, not an ownership or other interest in the forfeited property itself. See United States v. Ribadeneira, 105 F.3d 833, 836 (2d Cir. 1997) (per curiam) (holding that general creditors lack standing to contest forfeiture). Accordingly, the Trustee's petition is dismissed for lack of standing and for failure to state a claim. This dismissal, obviously, does not affect the Trustee's ability to assert contractual or other rights against the Neumans or anyone else in other proceedings.

### 2. KS Enterprise's Petition

As noted above, KS Enterprise claims to have purchased the Work from the Gallery on September 11, 2017, and then sold it back to the Gallery on September 25, 2017. The invoices for both transactions included a provision stating that title to the

12

Artwork would not pass to the buyer until payment was received by the seller. KS claims that it acquired title when it bought the Work (for which it transmitted payment). It further claims that it retained that title, even after it agreed to sell the Work back to the Gallery and even though the Gallery took possession, because KS was never paid.

The Government alleges – and KS does not contest – that the Government's interest in the Work arose, at the latest, on September 8, 2017, when Chowaiki fraudulently agreed to sell Le Clown to KS notwithstanding his agreement with the Neumans. Gov't Mem. 19; Tr. Feb. 7, 2019, at 5:14-15. Since the "act giving rise to forfeiture," 18 U.S.C. § 981(f), was Chowaiki fraudulently selling the work to KS, KS's interest was clearly not superior to that of Chowaiki at the time of that sale. See United States v. Emor, 785 F.3d 671, 681 (D.C. Cir. 2015) ("Core could not have taken a cognizable interest in the property because its interest vested at the same time as the government's interest.") (emphasis added). Accordingly, KS's petition does not state a claim for relief under 21 U.S.C. § 853(n)(6)(A). See Watts, 786 F.3d at 166 (noting that, to prevail under subsection (A), third party must "establish[] that he had a legal interest in the forfeited property before the underlying crime was committed") (quoting Timley, 507 F.3d at 1130).

13

The Government concedes that – taking, as the Court must, all facts alleged in KS's petition to be true – KS has sufficiently pleaded that it was a "bona fide purchaser for value" within the meaning of 21 U.S.C. § 853(n)(6)(B) when it bought the Work on September 11, 2017. Gov't Mem. 21 n.7. The parties also agree that the Gallery had the power to transfer title to the Work to a buyer in the ordinary course, regardless of any agreement with the Neumans, under the UCC's "entrustment" provision. See UCC § 2-403(2); Gov't Mem. 21; KS Opp. 4-5. For the purposes of this motion, then, KS is assumed to have held title to the Work as of September 11, 2017.

However, the Government argues that KS lost title when it sold the Work back to the Gallery. Gov't Mem. 21-22. The Government relies on UCC § 2-401(1), which provides that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest," unless the parties "explicitly agree[]" otherwise. Since the Gallery took possession of the Work, the Government argues that the provision of the invoice that purported to withhold title in fact only gave KS a security interest in the Work. The question is therefore whether the invoice from KS to the Gallery was sufficiently "explicit" about when title to the Work would pass.

The Court finds instructive the case of Subaru Distributors Corp. v. Subaru of America, Inc., No. 98-cv-5566, 2002 WL 188473 (S.D.N.Y. Feb. 5, 2002). There, the Court construed two versions of the same contract term relating to reservation of title. The first version of the term provided that title remained with the importer until the importer invoiced the distributor, "at which time title shall pass." Id. at *44. "That provision," the Court observed, "explicitly identified the exact moment when title passed," and therefore overrode § 2-401(1)'s default rule. Id. at *44-45. Later, however, the phrase "at which time title shall pass" was struck from the agreement. Id. at *45. Without that phrase, the remainder - which spoke of title "remain[ing]" with the importer - could "only be interpreted as retention of title language." Id. Thus, the provision as amended operated only to create a security interest, not to keep title with the importer.

The contract term here is materially indistinguishable from that in Subaru Distributors Corp., and the same reasoning applies. To escape § 2-401(1)'s default rule, a contract must explicitly identify when title passes. But KS's invoice does not do that; it only says when title shall not pass (i.e. not if payment hasn't yet been received and acknowledged). That leaves open the question of when title actually does pass - is payment a sufficient condition for the passage of title, or merely a necessary condition? If payment were to be made before delivery,

15

for example, would the buyer take title upon payment, or upon delivery? The invoice is silent on this question. Accordingly, the UCC requires that it be treated only as creating a security interest.

Therefore, when the Gallery took possession of the Work on September 25, 2017, it also took title, while KS retained only a security interest. See UCC § 2-401(2) (unless otherwise agreed, title passes to the buyer upon physical delivery of goods, despite reservation of security interest). This security interest constitutes a "legal interest" in the Work, and therefore KS's petition sufficiently alleges standing to contest the forfeiture. See Ribadeneira, 105 F.3d at 836. Whether it adequately states a claim for relief, however, is another matter.

Nowhere in its petition does KS allege that it perfected or recorded its security interest. Thus, the dispositive question is whether an unperfected security interest can trump the Government's interest in previously-forfeited goods. The Court concludes that it cannot. The Government's interest in forfeited property is "something like [that of] a secured creditor with a lien on the defendant's tainted assets superior to that of most any other party." Luis v. United States, 136 S. Ct. 1083, 1092 (2016). A secured creditor takes priority over subsequent unperfected security interests. UCC § 9-322(a)(3); see also

16

United States v. One 1987 Cadillac DeVille, 774 F. Supp. 221, 223-24 (D. Del. 1991) (concluding that unperfected security interest in car was insufficient to defeat forfeiture).

Taking all facts alleged in its petition as true, KS has at most an unperfected security interest in the Work that post-dates the vesting of the Government's interest. Such an interest is not enforceable against the Government. Accordingly, KS's petition is hereby dismissed for failure to state a claim upon which relief can be granted.

### 3. Piedmont's Petition

As recounted above, on September 19, 2017, Piedmont provided the Gallery with a loan, and the Gallery pledged several works (including Le Clown) as collateral. At this time, the Gallery had already sold the work to KS. The Government argues that, because the Gallery neither had rights in nor was in possession of the Work, it could not convey a security interest in the Work. See UCC § 9-203(a), (b)(2). Piedmont does not contest this point, see Piedmont Opp. 7-8, and the Court agrees with the Government. At the time of the loan, no security interest attached to the Work, and therefore Piedmont did not have a cognizable interest in the property at that time.

A more difficult question is whether Piedmont acquired an interest in the Work on October 19, 2017, when it agreed to accept the Work in satisfaction of the Gallery's debt. The

Government argues that it did not. The Government notes that the UCC entrustment provision, UCC § 2-403(2), applies only to a "buyer in the ordinary course," which does not include those who "acquire[] goods . . . in total or partial satisfaction of a money debt," UCC § 1-201(9), as Piedmont did here.

Piedmont does not dispute this part of the Government's analysis. Piedmont Resp. 7. Piedmont argues, however, that it need not rely on the entrustment provision, because the Gallery had title to the Work at the time it transferred the Work to Piedmont. Piedmont reaches this result by noting that the Government concedes, for the purpose of this motion, that KS Enterprise acquired title when it purchased the Work from the Gallery. Piedmont Resp. 5-6. Any consignment relationship between the Gallery and the Neumans was extinguished, because the Work was validly transferred pursuant to the UCC entrustment provision. The Neumans, on this interpretation, retained no interest in the Work – just a cause of action for breach of contract. Since KS took clear title to the Work, Piedmont reasons that KS was empowered to transfer clear title to any subsequent purchaser – including the Gallery. So when KS sold Le Clown back to the Gallery, the Gallery took possession not as a consignee for the Neumans, but as a full owner of the Work, just as any other buyer would have. And as a full owner, the Gallery was free to transfer the Work to Piedmont to satisfy its debt.

18

The Government responds that Piedmont's argument amounts to "title-laundering," Gov't Reply 4, allowing the Gallery to benefit from its fraud by simply passing the Work through an intermediary. The Government notes that the UCC is to be "liberally construed" to "promote its underlying purposes and policies," UCC § 1-103(a), and argues that the purpose of the entrustment provision is to protect innocent downstream buyers, not perpetrators of fraud. Gov't Reply 4-5.

The resolution of this issue depends on the nature of the agreement between the Neumans and the Gallery. If the Court were permitted to consider the consignment agreement in deciding this motion, it is clear the Government would have the better argument. The agreement clearly provides that the "Joint Venture [would] be terminated" "[u]pon the Sale of the Artwork and the Sale Price being paid to the Owner." Agreement ¶ 12 (emphasis added). Piedmont's argument that the consignment relationship was extinguished by the sale alone is contradicted by the plain language of the agreement. And if the consignment relationship survived, it is clear that the Gallery could only take possession of the Work subject to that preexisting contractual obligation. A consignee cannot obtain title to the object of a consignment that is superior to the consignor's interest simply by losing the object and then acquiring it again.

19

But the Court is not permitted to consult the Neumans' agreement at this time. The Government has moved to dismiss for lack of standing and failure to state a claim, and such motions must be resolved upon the pleadings. So while this Court may "look to the agreement itself" "[i]nsofar as the [petition] relies on [it]," Broder v. Cablevision Systems Corp., 418 F.3d 187, 196 (2d Cir. 2005), Piedmont's petition does not even mention the Neumans' agreement with the Gallery. True, Piedmont's legal briefing in opposition to this motion does reference the Agreement. But the sufficiency of a petition is determined by the allegations in the petition itself – not allegations in subsequent legal memoranda. Cf. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (holding that only where plaintiff "reli[ed] on the terms and effect of a document in drafting the complaint" may that document be considered in disposing of Rule 12(b)(6) motion).

At this early stage, taking all the facts alleged in Piedmont's petition to be true and drawing all reasonable inferences in Piedmont's favor, it is plausible that Piedmont acquired a legal interest in Le Clown as a bona fide purchaser for value. The Government's motion to dismiss Piedmont's petition for lack of standing and failure to state a claim is therefore denied.

20

**III. Conclusion**

The Government's motion is granted insofar as it asks this Court to dismiss the petitions of the Trustee and KS Enterprise. The Government's motion to dismiss is denied insofar as it asks this Court to dismiss Piedmont's petition. The remaining parties are instructed to convene a joint telephone call to the Court, no later than two weeks from the date of this Opinion and Order, to propose a discovery schedule for resolution of the remaining claims.

The Clerk of the Court is respectfully directed to close documents number 86 and 99 on the docket of this case.

SO ORDERED.

Dated:    New York, NY

          March 29, 2019             JED S. RAKOFF, U.S.D.J.

21